## SYNANON FOUNDATION, INC., Appellant,

### v.

## Stuart A. BERNSTEIN, Samuel J. Kushner, James H. Kabler III, and Coldwell Banker and Company, Inc., Appellees.

### No. 83-1372.

District of Columbia Court of Appeals.

Argued Feb. 6, 1985.

Decided Jan. 29, 1986.

Sherman L. Cohn, Washington, D.C., with whom Geoffrey P. Gitner and William F. Krebs, Washington, D.C. were on the brief, for appellant.

William Daniel Sullivan, with whom Warren K. Kaplan, Washington, D.C. was on the brief, for appellees Bernstein and Kushner.

John R. Cope, Washington, D.C. with whom Anne N. Foreman, Washington, D.C. was on the brief, for appellee Coldwell Banker and Company, Inc.

James H. Kabler, III, pro se.

Before NEBEKER, MACK and BELSON, Associate Judges.

MACK, Associate Judge:

This is an appeal from an order of the trial court dismissing plaintiff-appellant's complaint. The trial court found that dismissal of the complaint was warranted on two independent grounds: first, that the plaintiff had abused the discovery process; and second, that the plaintiff had perpetrated a fraud upon the court. We affirm on the second ground without deciding the merit of the first.

## I

### Factual Summary

Any written opinion in this case requires a laboriously detailed statement of the facts. The next fourteen and one-half pages recite such detail.

In summary, Synanon sought to buy an apartment building in Washington D.C. for office and residential purposes. Through its officers and attorneys, it represented itself as a peaceful, nonprofit organization. An initial deposit of $250,000 was made and Synanon moved in, pending settlement. Zoning difficulties surfaced; disputes arose between Synanon and the sellers and Syna-

non and other tenants. Unfavorable publicity thereafter exposed Synanon as anything but a peaceful entity. Both parties claimed each other in default under the purchasing agreement and Synanon sued for breach of contract and warranty. Answers and counterclaims were filed. When discovery proceeded, Synanon officers and attorneys perjured themselves in an attempt to secure favorable discovery rulings, at the same time destroying many corporate records. The sellers moved to dismiss and Judge Leonard Braman, after an eleven-day evidentiary hearing dismissed Synanon's complaint on the grounds of fraud on the court and abuse of the discovery process.

## II

### The Facts, In Detail

Plaintiff-appellant Synanon Foundation, Inc. [Synanon], was registered in 1958 as a tax-exempt, nonprofit organization under the laws of the State of California, for the avowed purpose of rehabilitating drug and alcohol abusers and engaging in research, public education, and charitable distribution. On April 18, 1978, Edward Siegel, the President of Synanon, approached defendant-appellee Coldwell Banker & Co., a real estate brokerage house, in regard to the possible purchase of a building in the District of Columbia that would be suitable for use both as Synanon's national headquarters and executive offices, and as a residence for Synanon members and residents. A sales agent for Coldwell Banker, appellee James Kabler III, had obtained a sales listing in December of 1977 from appellee Stuart Bernstein for an apartment building known as the "Boston House," located at 1711 Massachusetts Avenue, N.W. Kabler recommended the Boston House to Siegel because that part of the building that faces Massachusetts Avenue is in an area zoned "Special Purpose" [S–P], and at that time nonprofit organizations were permitted to maintain offices in S–P zoned locations as a matter of right. Kabler did not tell Siegel, however, that earli-

er that month, Coldwell Banker had received an inquiry from another potential purchaser interested in using the Boston House for office space. That individual had requested that Jeffrey Grene, another Coldwell Banker agent, determine the floor-load capacity of the building, since under the D.C. Building Code, a building that is zoned for offices may not be so used unless the floor-load capacity is 100 pounds per square foot on the first floor, and at least 60 pounds per square foot on the higher floors. Grene asked Kabler to determine the floor-load capacity of the Boston House, and Kabler asked Bernstein. When Bernstein could not locate the information, Grene called a D.C. building inspector, who looked at the original plans for the building and informed Grene that the floor-load capacity of the building as designed was only 40 pounds per square foot for the upper floors and 70 pounds per square foot for the lobby, and therefore, based on the original plans, the building was unsuitable for office use. Grene told Kabler that the potential purchaser was not interested in the building because the floor-load capacity was insufficient for his needs. Kabler, however, did not raise this potential problem with the Synanon representative, who made his inquiry one week later.

On April 21, Siegel, Kabler and Bernstein met to discuss Synanon's interest in the Boston House. Siegel characterized Synanon as a peaceful, charitable organization, but stated that it had recently received unfavorable publicity from the news media. Siegel did not reveal the details of this publicity: a December 1977 article in Time magazine, and a television report by KGO–TV in January 1978, both alleging that Synanon had strayed from its founding principles, and had been transformed by its founder, Charles Dederich, into a violent cult. Bernstein did not ask for any additional information, and said that he sympathized with Siegel because he knew that the press could often be unfair in its coverage. He also refused Siegel's offer of references, requesting only a financial state-

ment. Bernstein told Siegel that the zoning regulations permitted the use of the Boston House as offices by a nonprofit organization, and Kabler did not qualify that statement.

Three days later, Siegel met with Kabler, Bernstein, and Bernstein's attorney to discuss the terms of a purchase of the Boston House. Siegel once again mentioned media criticism of Synanon and difficulties it had had with zoning authorities in California. Bernstein's attorney called the D.C. zoning office during this meeting to confirm that part of the Boston House was zoned SP, and then stated to Siegel that at least part of the building could be used for offices. Kabler once again did not qualify this statement. Bernstein instructed his attorney to draw up an Agreement of Sale, which the parties executed on April 28.

The Agreement provided that Synanon would purchase the Boston House for $5,600,000. Closing was deferred until January 1979 in order to provide a tax advantage for Bernstein. Synanon gave Bernstein a down payment of $250,000, and was given permission to occupy the top two floors of the building pending settlement. By section 6(a) of the Agreement, Bernstein was given the right to retain the deposit in the event of Synanon's default. On the question of Synanon's intended use, section 5 of the Agreement provided: "Seller and Purchaser recognize that it is the Purchaser's intention to acquire the Building for the purpose of converting it into Purchaser's headquarters...." Section 3(f) of the Agreement states that part of the building was zoned to permit office use by nonprofit organizations. The Agreement did not explicitly recognize that a certificate of occupancy must be obtained prior to any non-residential use of building space in the District. See 11 DCMR § 3203.1 (1984). In order to obtain such a certificate, an applicant would be required to demonstrate that the floor-load capacity of the Boston House met the minimum requirements for office use under the Building Code. See 12 DCMR § 702.5

(1985). Although the Agreement did not specifically assign responsibility for obtaining the required certificate of occupancy for office use, Synanon contended in the trial court that this responsibility was Bernstein's under section 5(h) of the Agreement, which provided that "any claims asserted by ... governmental authority other than those based on the actions of Purchaser shall be the responsibility of Seller."

Synanon residents began to move into the apartment house during the last week in May. The Boston House Tenants' Association opposed the sale to Synanon, and together with an Advisory Neighborhood Council, it lobbied the D.C. Zoning Commission to change the zoning law in order to prohibit conversion of existing apartment units to offices without obtaining prior approval from the Board of Zoning Adjustment. On June 8, the Zoning Commission issued an emergency order, eliminating the zoning regulation that permitted the conversion of apartments to offices in SP zones as a matter of right, and providing that due to a housing shortage in the District, as an emergency measure all such conversions would require the review and approval of the Board of Zoning Adjustment. See 11 DCMR § 508.1 (1984). From June 12 through June 15, an evening TV news show ran a four-part series on the cult aspects of Synanon and its proclivity for violence. On June 15, Charles Dederich, Synanon's founder, became involved in an altercation with a Washington Post photographer outside the Boston House, and was subsequently charged, along with a second Synanon officer, with assault. During this period, according to Bernstein, he received complaints from Boston House tenants that Synanon had taken control of the front desk, that the organization was holding meetings in the lobby and early morning rallies in the courtyard, and that there had been unauthorized entries into some apartments.

On June 16, the Chief of Zoning Inspection notified Bernstein and Dederich that office use of the building would require a

special exception under the June 8 emergency order. Also on June 16, Bernstein, Kabler and Siegel met to discuss an upcoming meeting with the tenants' association. Kabler informed Siegel that one of the objections that the association was likely to raise at the meeting was the floor-load capacity of the building. Kabler informed Siegel, for the first time, that the floor-load capacity as listed in the plans for the building was insufficient for office use. At the meeting, the tenants did in fact raise this objection. Later in the day, Bernstein notified Synanon that he considered the tenants' allegations of harassment listed above to be a breach of the Agreement of Sale. On June 17 or 18, Synanon made the decision to move out.

On June 20, Bernstein sent notice to Synanon demanding that it cease its office use of the building until it obtained a certificate of occupancy. On June 21, Synanon hired a structural engineer to review the building plans, and also served a demand upon Bernstein that he obtain a certificate of occupancy and a special exception from the Board of Zoning Adjustment for office use of the building. On June 26, the structural engineer hired by Synanon reported that based on the building plans the Boston House could not be used for offices under the Building Code. On July 6, Bernstein purported to declare Synanon in default under the Agreement. On July 7, Synanon purported to rescind the contract based on Bernstein's failure to cure the various zoning problems in order to permit the building to be used for offices as contemplated by the Agreement of Sale.

Synanon subsequently filed the instant action in the Superior Court against the owners of the building, Bernstein and Samuel Kushner, and against the agent, Coldwell Banker, and its employee, Kabler. The complaint alleged fraud, breach of contract and breach of warranty, and requested the court to order rescission of the Agreement, return of the $250,000 deposit, restitution for various expenses, and punitive damages. The owners and the agent

each filed an answer, alleging that Synanon was forced to move out of the building not because the Boston House did not comply with the zoning requirements, but because of unfavorable publicity and because Charles Dederich wanted to escape prosecution for assault. Bernstein also filed a counterclaim. It initially alleged that Synanon was in default under various provisions of the Agreement that called for apartment and parking space rent payments, and in addition for lump sum payments of $5000 in lieu of rent for each of 35 apartments that had been vacated prior to settlement. Bernstein also requested damages for restoration costs, for legal fees, loss of future rents, and for "interference with Bernstein's prospective economic advantage" by causing him to lose tenants. On December 12, 1978—following additional publicity about Synanon's harassment of former members who left the organization, and about its policy of violence and its threats against members of the media who published unfavorable reports about its activities—Bernstein filed an amended counterclaim, in which he alleged for the first time that Synanon had procured the Agreement of Sale by fraud, in that it had not disclosed to him that it was an organization committed to violence.

The defendants served their first discovery request, consisting of 54 interrogatories, on February 6, 1979. Nineteen of these interrogatories were directed to the issue of whether or not Synanon was a violent organization. (Interrogatories 32–50.) Four interrogatories requested tapes that had been broadcast over an in-house Synanon communication network, the "wire," transcripts of those tapes, and indices. Major sources of programming for the "wire" were the taped and live pronouncements of Charles Dederich, Synanon's founder and leader. Dederich would hold morning meetings called "Think Tables," in which he would often spell out new directions for the organization. "Think Table" discussions were taped, and written summaries were created of the topics discussed. Synanon maintained an ar-

chive of 10,000 tapes, some of which were transcribed. It also employed an archivist, Steve Simon, who supervised the creation of a computerized subject matter index to existing transcripts of tapes, referencing the tape number for easy listening access. The index also included some untranscribed tapes. The subject matter index was not an index of "wire" broadcasts; the only way to identify the material broadcast over the Synanon "wire" was to examine daily broadcasting logs kept by the organization. As yet unaware of the existence of a subject matter index for all transcripts and some tapes at the time that the first set of interrogatories was filed, the defendants requested Synanon to identify all indices of tapes of Charles Dederich or Edward Siegel that were broadcast over the wire, or indices of transcripts of tapes of Dederich or Siegel broadcast over the wire, for the period January 1, 1977, through July 30, 1978. (Interrogatory 53.) In responding to this interrogatory, the defendants said that no index of wire broadcasts existed. The three other interrogatories requesting tapes and transcripts were as follows: In interrogatory 28, the defendants requested Synanon to identify all tapes or transcripts of wire broadcasts that referred to the period in May and June of 1978 when Synanon was in residence at the Boston House. In interrogatory 32, Synanon was asked to identify all documents, tapes, and transcripts of tapes referring to Bill and Sylvia Crawford, former Synanon residents who allegedly were harassed by Synanon after they left the organization. In interrogatory 34, the defendants asked Synanon to identify all tapes and transcripts of wire broadcasts including any discussion of Charles Dederich's policy on vasectomies for male Synanon residents.

Synanon responded to some of the interrogatories. It refused to answer the questions directed to the issue of violence or the question on the "vasectomy policy," on the ground that those interrogatories were not likely to lead to the discovery of admissible evidence. In addition, it stated that it would be unduly burdensome for it to iden-

tify material contained in tapes in the Synanon archives. The defendants filed a motion to compel answers, and on January 18, 1980, Judge William S. Thompson began a hearing on the motion. At the hearing, Dan L. Garrett, Jr., then general counsel for Synanon, sought to be admitted pro hac vice in order to argue against the motion to compel. Judge Thompson declined to grant this request on the ground that Garrett was potentially a witness in the case. Nevertheless, Garrett sat at counsel table, and through counsel represented that no index, summary or referencing of tapes in the Synanon archives had ever been accomplished. Garrett's position was that it would be unduly burdensome to require Synanon to respond to the interrogatories requesting it to identify tapes on certain subjects, because someone would have to listen to all the tapes in the archives in order to comply. The defendants produced an affidavit that had been filed in another case, in which Garrett's son had stated that Synanon employed Steve Simon specifically to index and reference the tapes. Garrett's counsel represented to the court that Garrett would be "willing to state under oath or as an officer of the court or in any capacity that such indices do not exist." When counsel for defendants asked to put Garrett on the stand in order to cross-examine him about the existence of an index, Synanon's counsel objected, telling the court that cross-examination would be "gratuitous."

Judge Thompson agreed, and relying partly on Garrett's representations as an officer of the court, he limited the scope of defendants' interrogatories to delete any requirement that Synanon identify particular tapes covering any substantial period of time. He limited interrogatory 28, compelling Synanon to provide only tapes of wire broadcasts made during June or July 1978. He eliminated the request for tapes of Dederich's statements on vasectomies, ordering the identification only of existing tape transcripts and indices referring to the subject. He similarly narrowed interrogatory

53 to eliminate the requirement that tapes be identified, ordering Synanon to identify only indices of tapes or transcripts of tapes of wire broadcasts by Charles Dederich or Ed Siegel from January 1, 1977 through July 30, 1978. Finally, Judge Thompson required Synanon to respond to interrogatories 47 through 50 to the extent of identifying any indices and paper documents referring to former Synanon residents threatened or beaten by the organization. Judge Thompson's January 23, 1980, order compelling answers to interrogatories is the only existing order compelling discovery ever entered in this litigation.[1]

In February 1980, Dan Garrett left Synanon, and was replaced as general counsel by Phillip Bourdette. Bourdette was subsequently admitted pro hac vice and was among counsel of record for Synanon in the trial court. On February 29, 1980, Synanon filed supplemental answers to the interrogatories in response to Judge Thompson's order. In regard to interrogatories 47 through 50—requesting documents referring to former Synanon residents who were harassed by the organization—Synanon's supplemental response was minimal. In regard to interrogatory 28 (which required Synanon to provide all wire broadcast tapes for June and July, 1978 that referred to Synanon's departure from the Boston House), and to interrogatory 53 (which required Synanon to identify all indices of tapes or tape transcripts of broadcasts by Dederich or Siegel from 1977–78), Synanon referred the defendants to the programming log for wire broadcasts, and stated that no index or abstract showing the content of any broadcasts existed. In a subsequent request for production of documents, filed April 16, 1980, the defendants identified and requested 103 potentially relevant tapes from the wire log that were broadcast in June and July 1978. Synanon ultimately produced four of these. The defendants also requested approximately 400 other tapes in which violence or money-making activities of Synanon were discussed. A small number of these tapes was produced. Defendants requested tapes or transcripts of tapes of telephone conversations to the Boston House from June 15 through June 19, 1978, and Synanon provided a limited response. Defendants also requested a tape of a phone conversation on June 17 between Dan Garrett and Synanon's attorney, and a tape of a wire broadcast on June 23, 1978, both of which defendants said they could not locate.

On June 19, 1980, the defendants filed a motion for sanctions based on Synanon's incomplete response to the document production requests. On May 7, 1981, following a hearing, Judge John D. Fauntleroy ordered Synanon to produce all of these documents and tapes within 90 days. Synanon moved for reconsideration of this order, and requested an evidentiary hearing on the question of whether any of the identified tapes existed. On October 3, 1981, Synanon's general counsel, and counsel of record in the case, Phillip Bourdette, filed an affidavit with Judge Fauntleroy stating that he had personally supervised a search of the Synanon archives and could find no additional material responsive to the document production request. At hearings in November 1981 and April 1982, Steven Simon, the Synanon archivist, stated that Synanon tapes were routinely "recycled," and that although none of the requested tapes now existed, they had not been deliberately destroyed. Based on this testimony, on April 26, 1982, Judge Fauntleroy vacated his order of May 7, 1981 compelling production of documents.

Defendants subsequently filed a second motion for sanctions, which was denied by Judge Carlisle E. Pratt on June 25, 1982. On February 8, 1983, the case was assigned to Judge Leonard Braman. In July 1983, defendants obtained information that

---

1. Although Judge Fauntleroy also granted a motion to compel later in the litigation, he later vacated that order. *See infra.*

Synanon, with the active participation of its in-house legal staff—including Dan Garrett and Phillip Bourdette—had engaged in a massive scheme, in anticipation of and in response to discovery requests in this case and in several others, to delete incriminating information from tapes in the Synanon archives and to burn or hide other tapes that could not successfully be "doctored." Defendants also discovered the existence of the subject-matter index, and were informed that Steve Simon, Synanon's archivist, had supervised a project at the direction of the Synanon legal department to eliminate incriminating topic headings so as to make access to the remaining tapes more difficult. Defendants obtained this information from affidavits by two former Synanon residents who had witnessed and participated in the destruction, Bette Fleishman and George Farnsworth.[2] Based on these affidavits, the defendants filed a motion to dismiss Synanon's complaint. Defendants alleged that dismissal of the complaint was warranted as a sanction for Synanon's willful abuse of discovery under Super.Ct.Civ.R. 37. Defendants also argued that the participation by Synanon's legal counsel, Garrett and Bourdette, in the destruction of tapes and documents, and their attempts to mislead Judges Thompson and Fauntleroy, had worked a fraud upon the court that independently warranted dismissal of the action.

Judge Leonard Braman held an eleven-day evidentiary hearing on the motion to dismiss. Farnsworth testified, and defendants presented a videotape of Fleishman. According to their testimony, in October of 1978, Dan Garrett and Steve Simon and another Synanon resident spent two weeks in a trailer listening to tapes. Simon told Fleishman that incriminating tapes were destroyed during that period. In November 1978, tapes were flown out of the Synanon archives to a different location where they were burned at Steven Simon's direction. In December, more tapes were destroyed. Also in that month, Phillip Bourdette ordered all tape recordings and tape summaries distributed throughout Synanon to be turned over to the legal department. In response to this order, Farnsworth testified, he collected tapes and his wife gave them to Bourdette. In March of 1979—immediately following the filing of defendants' first set of interrogatories—Steve Simon approached Farnsworth, who was in charge of the archive computer system. That system contained the transcript subject matter index (organized by key word) and a tape inventory that could identify all tapes by title or date. Simon told Farnsworth that the indices were dangerous and needed to be purged. Simon also told him that he had the approval of the legal department for this project. Farnsworth provided Simon with a complete printout of indices by title, date and subject matter. Simon marked those entries on the printout for which he wanted Farnsworth to delete the corresponding data file. Farnsworth deleted key words from the subject lists and tape numbers from the tape inventory. He burned all evidence of deletion. Farnsworth revealed that the computer tape inventory, that was presented to Judge Fauntleroy in connection with Simon's testimony that led to a vacation of that court's previous order compelling production of documents (see p. 1261 supra) was an intentionally changed inventory from which entire tapes had been deleted at Simon's direction.

In April of 1979, Farnsworth approached Bourdette in order to attempt to confirm that his deletion at Simon's order of parts of the transcript index and tape inventory was legal. Bourdette said that he knew what Simon was doing and that Simon was not acting on his own. Bourdette explained that the goal of the deletion project

2. These affidavits were submitted by the United States in an action by Synanon filed in the United States District Court for the District of Columbia. In that action, Synanon requested, and was denied, a declaratory judgment that the Internal Revenue Service had improperly revoked its tax-exempt status. See Synanon Church v. United States, 579 F.Supp. 967 (D.D.C. 1984).

was to make it difficult for people with whom Synanon was involved in litigation to zero in on relevant transcripts, and maintained that Farnsworth's actions were legal as long as the particular items deleted had not yet been requested in litigation.

On September 5, 1979, Farnsworth was present at a dinner meeting between Steve Simon and Dan Garrett where the progress of the erasure project was discussed. During September, Farnsworth deleted more references, and in January of 1980, he deleted an additional batch of topics. He estimated that he had deleted a total of 180 topic references.

Despite the fact that, on January 18, 1980, Dan Garrett had represented to Judge Thompson that the only way to identify tapes relating to specific topics was to listen to each tape in the archive, Bette Fleishman testified (in the evidentiary hearing before Judge Braman) that in February of 1980 she was recruited to work in the archives deleting and erasing tapes on Simon's instructions. She stated that Simon received information from Bourdette concerning materials sought in various lawsuits in which Synanon was involved. Simon in turn gave Fleishman a "sensitive subject" list, and she prepared logs of matters appearing on the list and delivered them to Simon. Simon, together with Bourdette's wife and another Synanon attorney, then determined which material to destroy. Once the material was identified, Fleishman would burn the tape label and the topic log and erase the tapes. Other tapes were relabeled in order to avoid subpoenas and document requests in a number of different cases. Simon told Fleishman that he and Bourdette had agreed that Simon would have to lie in various proceedings. By the Summer of 1980, the indices were adjusted and the tape references corresponding to the topic index were erased. Fleishman estimated that more than 100 tapes were erased. During this period, Simon told Fleishman that he had perjured himself when he stated at his deposition that tapes were routinely recycled and that

no tapes had been destroyed. In this regard Farnsworth testified before Judge Braman that to his knowledge no tapes were ever reused.

Very little direct contradiction of the testimony of Farnsworth and Fleishman was presented by Synanon in the hearing before Judge Braman, since on key points Phillip Bourdette invoked his Fifth Amendment privilege, and other witnesses presented by Synanon had no direct knowledge of the erasure project.

Judge Braman found Farnsworth and Fleishman credible. Based on their testimony, Judge Braman held that Synanon's destruction of materials requested by the defendants through the discovery process warranted dismissal of the complaint. He found that the materials destroyed, among others, related to "violence, money, purchase of guns, legal terror tactics, Holy War, changing partners or love match." This material, Judge Braman held, was relevant to the complaint because it bore on Synanon's "nonprofit" status.

The trial court in addition held that Synanon's in-house attorneys had perpetrated a fraud on the court of sufficient magnitude to warrant dismissal of the complaint. This appeal followed.

### III

 We find ample evidence in the record to support Judge Braman's conclusion that the involvement of the Synanon executives and attorneys in the fraud, their subornation of perjury and their own false statements to Judge Thompson and Fauntleroy constituted a fraud on the court, warranting dismissal of the complaint.

The record in this case demonstrates "the most egregious conduct" by an officer of the court, including "the perpetration of fraud" and "a corruption of the judicial process itself." *Lockwood v. Bowles*, 46 F.R.D. 625, 632 (D.D.C.1969). The evidence presented to Judge Braman shows the existence of an " 'unconscionable plan or scheme' " by counsel of record, Phillip Bourdette, and another lawyer for Syna-

non, Dan Garrett, " 'designed to improperly influence the court in its decision.' " *Id.* at 631 (citation omitted). There is no question that counsel for Synanon attempted to perpetrate a fraud upon at least two trial judges, with the intent of preventing " 'the judicial machinery [from] perform[ing] in the usual manner its impartial task of adjudging cases that are presented for adjudication.' " *Id.* (citation omitted). The involvement of an officer of the court in "a carefully planned scheme calculated to deceive the court" is the type of misconduct that warrants dismissal of the complaint. *Southerland v. County of Oakland,* 77 F.R.D. 727, 733 (E.D.Mich.1978) (fraudulent statements to court by attorney, an officer of the court, justify vacation of judgment), *aff'd,* 628 F.2d 978 (6th Cir.1980).

In the hearing before Judge Thompson, Synanon's first general counsel, Dan Garrett, asked that he be admitted pro hac vice in order to argue—falsely—that the defendants' requests for the identification of tapes in the Synanon archives on specific topics were unreasonable because Synanon had no means of determining the content of those tapes other than by listening to them. When Judge Thompson refused to admit Garrett pro hac vice, Garrett offered to testify under oath that the Synanon archivist had not indexed, summarized or cross-referenced any of the tapes, a demonstrably false assertion. Judge Thompson relied on Garrett's representation as an attorney, and did not find it necessary to permit the defendants to cross-examine him on this statement. Based in substantial part on Garrett's statement, Judge Thompson narrowed the scope of defendants' first set of interrogatories considerably.

■ Similarly relying on the representations of Phillip Bourdette, counsel of record for Synanon in this case, Judge Fauntleroy vacated a prior order compelling Synanon to produce documents in response to the defendants' first request for production of documents. Bourdette filed an affidavit stating that he had conducted a "diligent" search and could find no documents responsive to the court's order. Although Bourdette may have been technically correct at the time he filed his affidavit that no responsive documents could be found, the reason this would have been so is Bourdette's sponsorship and supervision of a massive program to destroy damaging and incriminating information contained in the Synanon archives. The purpose of Bourdette's disingenuous representation, as well as Garrett's false statements to Judge Thompson, was as Judge Braman found, to deceive the court, and to improperly influence the court in its decision on the defendants' motions to compel, with the ultimate aim of preventing the judicial process from operating in an impartial fashion. These actions by Synanon's counsel warrant dismissal of the complaint. *See Hazel-Atlas Glass Co. v. Hartford-Empire Co.,* 322 U.S. 238, 246–47, 64 S.Ct. 997, 1001–02, 88 L.Ed. 1250 (1944) (attorney tampering with administration of justice requires vacation of judgment, whether or not behavior actually influenced outcome of trial); *id.* at 251, 64 S.Ct. 1003 (Roberts, J., dissenting) ("No fraud is more odious than an attempt to subvert the administration of justice."); *Great Coastal Express, Inc. v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America,* 675 F.2d 1349, 1357 (4th Cir.1982) ("Involvement of an attorney, as an officer of the court, in a scheme to suborn perjury would certainly be considered fraud on the court."), *cert. denied,* 459 U.S. 1128, 103 S.Ct. 764, 74 L.Ed.2d 978 (1983); *H.K. Porter Co. v. Goodyear Tire & Rubber Co.,* 536 F.2d 1115, 1119 (6th Cir.1976) ("Since attorneys are officers of the court, their conduct, if dishonest, would constitute fraud on the court."); 7 MOORE'S FEDERAL PRACTICE § 60.33, at 359 (2d ed.1985) (Attorney's loyalty to client "obviously does not demand that he act dishonestly or fraudulently; on the contrary his loyalty to the court, as an officer thereof, demands integrity and honest dealing with the court. And when he departs from that standard in the conduct of a case he perpetrates a fraud upon the court.")

■ Counsel for Synanon argues that the Superior Court Civil Rules only contemplate vacation of an already entered judgment as a remedy for fraud on the court, and do not provide for dismissal of an action prior to trial on this basis. Super.Ct. Civ.R. 60(b). Rule 60(b), however, does not subsume or abrogate the court's "inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice." *Wyle v. R.J. Reynolds Industries, Inc.,* 709 F.2d 585, 589 (9th Cir.1983). *See Link v. Wabash Railroad Co.,* 370 U.S. 626, 630, 632, 82 S.Ct. 1386, 1388, 1389, 8 L.Ed.2d 734 (1962) (federal Rule 41(b) does not abrogate court's inherent power to dismiss action based on counsel's failure to comply with rules of court). The claim of "fraud on the court" is similar in effect to the equitable defense of unclean hands. In an action in equity, " 'he who asks relief must have acted in good faith. The equitable powers of th[e] court can never be exerted in behalf of one who has acted fraudulently or who by deceit or any unfair means has gained an advantage. To aid a party in such a case would make th[e] court the abetter of iniquity.' " *Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 245, 54 S.Ct. 146, 147, 78 L.Ed. 293 (1933) (citation omitted). Such a party "must keep his hands clean throughout the litigation," or his action will be subject to dismissal. *American Insurance Co. v. Scheufler,* 129 F.2d 143, 148 (8th Cir.), *cert. denied,* 317 U.S. 687, 63 S.Ct. 257, 87 L.Ed. 551 (1942). Thus, while " 'equity does not demand that its suitors shall have led blameless lives,' ... it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue." *Mas v. Coca-Cola Co.,* 163 F.2d 505, 509 (4th Cir.1947) (citation omitted). A

plaintiff's non-compliance with this requirement warrants dismissal of his action.

In sum, the participation by Synanon's high officials and counsel, in successful attempts to deceive the court and to influence its decisions, was conduct which the administration of justice cannot tolerate. Indeed counsel's behavior was "such a violation of a lawyer's duty to the court—a duty imposed not alone by principles of honesty and good morals but also by a code of ethics adopted as rules of court[—] as to amount to a fraud on the court for which equity will grant relief." [3] *Sutter v. Easterly,* 354 Mo. 282, 292, 189 S.W.2d 284, 287 (1945) (cited in *Lockwood v. Bowles, supra,* 46 F.R.D. at 632 n. 31). The decision of the trial court dismissing the complaint based on this conduct is therefore

*Affirmed.*[4]

Separate statement by Associate Judge MACK:

The majority chooses not to reach the major question decided by the trial court— its decision to grant the defendants' motion to dismiss the complaint based on Synanon's destruction of evidence. I do not think we can ignore the trial court's holding in this respect; 42 pages of its 45-page oral opinion are addressed primarily to Synanon's conduct in destroying evidence and the relevance of that conduct to the issue of whether there has been discovery abuse in this contractual dispute. The diligence of the trial court in marshalling these facts commands respect. And while the court's deep concern is understandable in view of the depravity connoted by this record, I believe that Synanon—putting to one side the "fraud on the court" issue—was otherwise entitled to a hearing on its legal contractual claims and a fair review of the

---

3. The Clerk of this court is directed to forward a copy of this opinion to the Bar Counsel of the District of Columbia and to disciplinary authorities of other appropriate jurisdictions.

4. Still pending before this division, and awaiting the conclusion of all proceedings in the instant appeal, is the Appeal No. 84–1635 from the November 9, 1985 Order of Judge Braman awarding attorneys' fees and expenses of litigation in the amount of $585,852.80 in favor of defendants and counterclaimants.

denial of that hearing on appeal. One may forfeit the right to use our judicial system because of abuse relevant to such use; one does not forfeit that right because of bad character or conduct irrelevant thereto. I would therefore look to the trial court's dismissal of the complaint on the grounds that there had been an abuse of the discovery process.

The trial court found by clear and convincing evidence that the willful destruction and alteration of materials by Synanon during the discovery process warranted dismissal. Thus, it found that subject matter categories deleted from Synanon's computer index included "violence, money, purchase of guns, legal terror tactics, Holy War, changing partners or love match." The court further found that the tapes on these subjects were relevant to the complaint (and therefore the defendants were prejudiced by their nonproduction), noting:

> [Their relevance] has to do with Synanon's status. That is, whether during the material times involved in this case, Synanon was a non-profit corporation. If it was not a non-profit corporation, then it would not, under the applicable zoning laws which applied at the time, be permitted to use the subject property for office purposes, as well as residential purposes[, s]ince the zoning was predicated on the non-profit status of the organization in question.... [W]hether Synanon was a non-profit corporation turned upon whether its corporate policy contravened fundamental public law policy.... The [] issue having to do with Synanon's status applies to all the parties defendant since it inheres in the com-

plaint. That is, it is an issue which is inextricably involved in the entitlement of Synanon to recover.... [V]iolence was an issue in this case and was implicated as an issue by the complaint.... Also, guns, siphoning of money, changing partners are issues, at least arguably for the purposes of motivating destruction.

The trial court thus found that the nonproduction of these materials "probably would have had a dispositive bearing upon Synanon's complaint, that is, its nonprofit status." It went on to find that no sanction other than dismissal would be appropriate here, because "[o]ne of the issues in this case is whether high management of Synanon directed or condoned violence or other activities which contravened fundamental public law policy." Dederich's pronouncements on tape, the court found, were the "best evidence of this policy," and for this reason, no sanction other than dismissal could cure the prejudice to the defendants from the destruction of this evidence.

It is indisputable that Synanon willfully destroyed a substantial number of tapes and other materials that had been requested by the defendants in discovery. However, it does not necessarily follow from the fact that material requested by the defendants was subsequently found to have been destroyed, that the defendants were actually prejudiced by its nonproduction. In evaluating whether dismissal of a complaint is warranted as a sanction for willful failure to comply with a court order compelling discovery under Super.Ct.Civ.R. 37,[5] the trial court must "evaluate the prej-

---

5. Super.Ct.Civ.R. 37 is the exclusive route by which a trial court may impose sanctions for failure to comply with a court order compelling discovery. The court may not resort to other rules to justify such sanctions, nor may it dismiss based on discovery abuse under any other rubric ("unclean hands," for example) using its "inherent" powers. *Societe Internationale v. Rogers,* 357 U.S. 197, 207, 78 S.Ct. 1087, 1093, 2 L.Ed.2d 1255 (1958). Normally, sanctions may be imposed under Rule 37 "only upon failure to comply with an order of the court." *Henneke v. Sommer,* 431 A.2d 6, 8 (D.C.1981). If a party's

responses to discovery requests are incomplete or evasive, it is incumbent upon the opposing litigant to request the court to resolve the outstanding questions by order. It is an abuse of discretion to impose a weighty sanction upon a litigant for failure to respond fully to discovery requests absent an outstanding court order directing compliance. *Id.* at 9. Compare Rule 37(d). I note that the only court order in this litigation compelling discovery was Judge Thompson's order of January 23, 1980, compelling answers to several interrogatories. At issue are Synanon's supplemental responses to Inter-

udice to the moving party" by its failure to obtain the requested materials, and must also "consider alternative, less harmful sanctions" than dismissal, which is "the most draconian sanction" that may be imposed. *Shimer v. Edwards*, 482 A.2d 399, 400–01 (D.C.1984); *see Massengale v. 3M Business Products Sales, Inc.*, 504 A.2d 574 (D.C.1985); *Vernell v. Gould*, 495 A.2d 306, 311 (D.C.1985). I do not believe that the findings prerequisite to dismissal based on discovery abuse have been demonstrated in this case.

### I

#### The Relevance of Nonprofit Status

It is apparent from even the most cursory reading of Judge Braman's opinion that the basis for his dismissal of the complaint as a sanction for discovery abuse under Rule 37 was his belief that material relevant to Synanon's nonprofit status had been destroyed or withheld, and that the defendants were prejudiced by Synanon's actions because Synanon's "nonprofit status is inextricably involved in the entitlement of Synanon to recover."

In my view the trial court was in error in concluding that Synanon's nonprofit status was in issue, that as a matter of law Synanon had forfeited that status, that its non-profit status was relevant to the complaint or the defense, and that such status would have a dispositive bearing on Synanon's right to recover.

The court did not parse out the basis for its conclusion that Synanon's nonprofit status was a key issue. The complaint asked for a rescission of a contract because of fraudulent misrepresentations by the defendants. The defendants did not raise Synanon's status as a defense to the action in their answer to the complaint; this issue was first raised in the court's pretrial order, where it stated that although the pleadings did not set forth Synanon's status as a question to be adjudicated, that status was fairly put into issue by the defendants' discovery requests and therefore would be an issue at trial.

I do not see the relevance of Synanon's nonprofit status to the issues raised by the dismissed complaint. I see no nexus between Synanon's relatively uncomplicated action for rescission of the Boston House contract based on fraudulent misrepresentations by the defendants, and the question of whether Synanon is a violent organization. Since I do not find Synanon's violence to be relevant to the complaint or the defenses asserted in the answers, I cannot see how the defendants could have been

rogatories 28, 47–50, and 53. Interrogatories 28 and 53 required Synanon to identify tapes of wire broadcasts made by Dederich or Siegel from January 1, 1977, through July 30, 1978, and to identify wire broadcasts in June and July, 1978. Synanon partially complied with these interrogatories by providing broadcasting for the period in question. Synanon's answers to interrogatories 47 through 50, requesting information on former residents of Synanon who had been threatened, were incomplete. Synanon also failed to identify its subject matter index and tape inventory in response to these interrogatories. Under our cases, the trial court was authorized to impose sanctions only for this evidence of non-compliance with the January 23, 1980, order. The evidentiary hearing held by Judge Braman was not limited to an assessment of the information withheld under this order, however, but was much broader in scope, encompassing the fate of all materials requested by defendants during the course of this litigation. After hearing this evidence, the trial

court's dismissal order did not focus on Synanon's failure to comply with the January 23rd order, but instead seemed to accord mere discovery requests the force of court orders. I recognize, however, that Judge Thompson's order compelling discovery was more limited than it might otherwise have been because he relied on false representations by counsel for Synanon as to the difficulty of accessing the tape archives. Similarly, Judge Fauntleroy vacated his 1981 order requiring Synanon to produce every document and tape requested in the defendants' First Request for Production of Documents based on the false representations of Synanon's archivist and of Phillip Bourdette, Synanon's general counsel and counsel of record in this case. For purposes of my analysis of Judge Braman's dismissal on Rule 37 grounds, therefore, I assume without deciding that all of the tapes and documents requested in the defendants' first set of interrogatories and document production requests were constructively subject to a court order.

prejudiced by Synanon's destruction of tapes that revealed the organization's, and its founder's, true nature. Similarly, since the commercial activity and deviant sexual practices of the organization are irrelevant to the issues raised by the complaint, their nonproduction worked no prejudice to the defendants' case. *See Pollock v. Brown*, 395 A.2d 50, 52 (D.C.1978). Of the hundreds of tapes requested by the defendants—many of which apparently were destroyed—only a relatively small number were likely to lead to the discovery of admissible evidence on any issue framed by the complaint and the answers. Yet it is only the categories of tapes and corresponding subject matter topics on the transcript index relating to violence, sex, and commercial activity that were specifically found by the trial court to have been destroyed or erased. The record does not reveal the extent to which any relevant tapes were erased or disguised. Similarly, the record does not reveal whether there were topics relevant to the case in the subject matter index, and whether those topics were eliminated. For example, we do not know whether there was a "Boston House" or even a "Washington" topic. The testimony of Farnsworth and Fleishman indicates that most of the topic headings and corresponding tape excerpts that were deleted were relevant to the questions of violence, deviant practices, and money. The scheme actually was instituted in response to a case filed against Dederich in 1978, in which Synanon's propensity for violence was the key issue. We may of course assume that tapes relevant to the present case were destroyed in the massive effort to destroy incriminating information that had been requested through discovery in the many different cases in which Synanon was involved. Since the trial court, however, placed such heavy emphasis upon the relevance of Synanon's nonprofit status in determining the prejudice to the defendants by the nonproduction of material relevant to that status, I do not believe that we could find a proper exercise of discretion in the trial court's evaluation of the sanction to impose in this case.[6] *See Shimer v. Edwards, supra,* 482 A.2d at 401; *Vernell v. Gould, supra,* 495 A.2d at 311; *Braxton v. Howard University,* 472 A.2d 1363, 1365 (D.C.1984); *Ungar Motors v. Abdemoulaie,* 463 A.2d 686, 688–89 (D.C.1983).

## II

### The Defining of Nonprofit Status; The Incidents Following Therefrom

The trial court, in concluding that Synanon's status was inextricably bound up with its right to recover, did not identify the nature or scope of any inquiry into that status. We may safely presume that a trial judge on the District of Columbia Superior Court has no authority to evaluate or revoke a grant of non-profit status by the State of California. Upon principles of comity, organizations registered as nonprofits under California law and the laws of other states are permitted to do business as nonprofit organizations in the District of

---

**6.** Although Synanon's violence is relevant to Bernstein's amended counterclaim based on his allegation that Synanon represented itself as a peaceful and nonviolent organization, the court's sanction was not directed to the counterclaim, which remains pending in the trial court. It is noteworthy that the record is replete with evidence that Synanon's goals and means are violent. It is unnecessary to remind counsel that the objective of the pretrial discovery rules is to allow a party to obtain all of the facts relevant to a claim or defense. By the time this case came before Judge Braman there was ample evidence in the public record that Synanon was not a peaceful organization. The trial courts should be on guard to prevent a party from employing the discovery rules with the long-range objective of trapping his opponent into the imposition of the most severe sanction, dismissal. Moreover, where destroyed materials are not relevant to the issues framed by the complaint and the answers, I believe that an appropriate response to a finding that a party was prejudiced in the presentation of his counterclaim by the destruction of materials would be to take all facts to which the discovery was relevant as established, *see* Super.Ct.Civ.R. 37(b)(2)(A); *Black v. Sheraton Corp. of Am.,* 371 F.Supp. 97, 102 (D.D.C.1974), or to enter a default judgment on the counterclaim, Super.Ct. Civ.R. 37(b)(2)(C), rather than to dismiss the complaint.

Columbia. *Pensacola Telegraph Co. v. Western Union Telegraph Co.,* 96 U.S. (6 OTTO) 1, 13, 24 L.Ed. 708 (1878). In order "to bring such corporations under the supervision and the regulation of public officials charged with such responsibility to the end that the public may have the same information respecting their background and financial standing[,] character and [] management which is demanded of domestic corporations," *Hill-Lanham, Inc. v. Lightview Development Corp.,* 163 F.Supp. 475, 476 (D.D.C.1957), foreign corporations are required to obtain a certificate of authority from the Mayor of the District of Columbia before they may do any business in this city. *See* D.C.Code § 29–565(a) (1981).[7] *See also Federal Loose Leaf Corp. v. Woodhouse Stationery Co.,* 163 F.Supp. 482, 483 (D.D.C.1958). Since Synanon is a nonprofit corporation under California law, it is entitled to operate as a nonprofit organization in the District of Columbia if it obtains such a certificate.[8] Once the certificate is procured, the foreign corporation shall "enjoy the same rights and privileges as … a domestic

corporation organized for the purposes set forth in the application pursuant to which such certificate of authority is issued." D.C.Code § 29–566(b). By statute, the Mayor is given exclusive authority over both the grant and the revocation of certificates of authority, *see id.* § 29–570(b) (grant); *id.* § 29–580 (revocation); *id.* § 29–594(b) ("The Mayor shall be charged with the administration and enforcement of this chapter.") The Mayor may refuse to grant, or may grant and then revoke, a certificate of authority if the nonprofit corporation desires or attempts to conduct affairs in the District that a District nonprofit corporation would not be permitted to conduct. *Id.* § 29–565(a). If the Mayor declines to grant, or grants and then revokes, a certificate of authority for a foreign corporation, that corporation has a right of appeal to the courts. *Id.* § 29–595. All civil and criminal actions to enforce the certificate of authority requirements are committed to the jurisdiction of the D.C. government. *Id.* § 29–599.7.[9]

Even if Synanon had not obtained a certificate of authority from the Mayor, its

---

**7.** That section provides:

A foreign corporation to which this chapter is applicable shall procure a certificate of authority from the Mayor before it conducts affairs in the District, but no foreign corporation shall be entitled to procure a certificate of authority under this chapter to conduct in the District any affairs which a corporation organized under this chapter is not permitted to conduct. A foreign corporation shall not be denied a certificate of authority by reason of the fact that the laws of the state or country under which such corporation is organized governing its organization and internal affairs differ from the laws of the District, and nothing in this chapter contained shall be construed to authorize the District to regulate the organization or the internal affairs of such corporation.

**8.** By purchasing the Boston House for use as its executive headquarters, Synanon was doing sufficient business in the District to require a certificate of authority. *See Ferguson Contracting Co. v. Coal & Coke Ry. Co.,* 33 App.D.C. 159, 170 (1909). *See also* 17 FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 8486 (R. Eickhoff & R. Klaus ed. 1977).

**9.** Since the task of regulating foreign nonprofit corporations and of determining when such cor-

porations will be permitted to operate in the District of Columbia is delegated by statute to the Mayor, it cannot be argued that the zoning authorities in the District have the power to determine whether a foreign corporation is or is not a nonprofit organization for purposes of the zoning law. Although the zoning regulations contain a definition of "nonprofit organization," *see* 11 DCMR § 199 (1984), that definition must be viewed as a guideline for non-corporate organizations which, unlike Synanon, are not registered with any state authority as nonprofit in nature. For it cannot be argued that the Board of Zoning Adjustment is empowered to independently review the actions of a corporation that is registered under the laws of a state as a nonprofit organization and is seeking to establish an office in an S–P zoned area, in order to determine whether it is truly nonprofit in character. The Board has neither the resources nor the expertise to conduct such an inquiry. The issuance of a certificate of authority by the Mayor permitting a foreign corporation to transact business in the District of Columbia must be conclusive upon the Zoning Board in its evaluation of a proposed use that is permitted only to a nonprofit corporation under the zoning regulations.

status as a registered California nonprofit corporation permits it to enter into enforceable contracts in the District of Columbia. District of Columbia law expressly preserves the validity of contracts of foreign nonprofit corporations even if they have failed to obtain the required certificate of authority. D.C.Code § 29–583(b) ("The failure of a foreign corporation to obtain a certificate of authority to conduct affairs in the District shall not impair the validity of any contract or act of such corporation. . . ."). *See Federal Loose Leaf Corp. v. Woodhouse Stationery Co., supra,* 163 F.Supp. at 483.[10]

Unfortunately, none of the parties to this appeal has considered the application to this case of the certificate of authority requirement. There is thus no proof in the record that Synanon obtained a certificate of authority from the District of Columbia. The trial court in its pretrial order, mentions that Synanon has qualified as a nonprofit organization under the law of the District of Columbia. Assuming that it has done so, it is within the purview of the Mayor and the D.C. government to revoke this grant of authority to act as a nonprofit corporation in the District. "[N]o citizen of a State can enjoin a foreign corporation from pursuing its business. Until the State acts in its sovereign capacity, individual citizens cannot complain. The State must determine for itself when the public good requires that its [] assent to the admission shall be withdrawn." *Pensacola Telegraph Co. v. Western Union Telegraph Co., supra,* 96 U.S. (6 OTTO) at 13.

Even if Synanon has not obtained a certificate of authority, however, I still could not find any relevance of Synanon's nonprofit status to the complaint. In evaluating state statutes designed to regulate the activities of foreign corporations, the Supreme Court has held that unless the statute expressly declares void all contracts entered into by foreign corporations without obtaining a certificate of authority, or creates a private right of action in favor of those who do business with the foreign corporation—allowing those parties to enforce the statute through private civil suits—these types of provisions will not be read into the statute and enforcement will lie exclusively with the state government. *Seymour v. Slide & Spur Gold Mines,* 153 U.S. 523, 525, 14 S.Ct. 847, 38 L.Ed. 807 (1894); *Fritts v. Palmer,* 132 U.S. 282, 289–93, 10 S.Ct. 93, 95–6, 33 L.Ed. 817 (1889); *Cowell v. Colorado Springs Co.,* 100 U.S. (10 OTTO) 55, 60–61, 25 L.Ed. 547 (1879); *Pensacola Telegraph Co. v. Western Union Telegraph Co., supra,* 96 U.S. (6 OTTO) at 13.[11] *See also Groo v. Norman & Robinson,* 42 App.D.C. 387, 390 (1914) ("The modern rule, from which we have been unable to find any substantial departure, is that the title of a [foreign] corporation to real estate held in excess of its powers [under the law of the state] is good until invalidated in a direct proceeding instituted by the soverign. . . .").

The D.C.Code does not create a private right of action in favor of parties with whom a foreign corporation contracts, to permit such parties to obtain a declaration that the contract is void based on the corporation's failure to comply with statutory

---

**10.** *See also Fritts v. Palmer,* 132 U.S. 282, 289–90, 10 S.Ct. 93, 95, 33 L.Ed. 817 (1889):

> If the legislature had intended to declare that no title should pass under a conveyance to a foreign corporation purchasing real estate before it acquires the right to engage in business in the State, and that such a conveyance should be an absolute nullity as between the grantor and grantee, leaving the grantor to deal with the property as if he had never sold it, that intention would have been clearly manifested.

**11.** *See also Federal Loose Leaf Corp. v. Woodhouse Stationery Co., supra,* 163 F.Supp. at 483 (purpose of certificate of authority requirement in the District is not "'to put into the hands of those[] with whom [foreign corporations] may contract . . . a weapon of substantial defense, which might in conceivable cases amount to immunity from liability; but its aim is rather to bring foreign corporations under the supervision and regulation of state officials'" [citation omitted] ); *Hill-Lanham, Inc. v. Lightview Dev. Corp., supra,* 163 F.Supp. at 476 (same).

requirements. The statute does create a limited defense that may be raised by such parties, however, when the corporation sues on its contract without first obtaining the requisite certificate. The Code provides that Synanon would not be permitted to "maintain any action" in "any court of the District" without first obtaining a certificate of authority. D.C.Code § 29–583(a). This section has been interpreted to require a court to stay an action by a foreign corporation that sues on a contract without obtaining the certificate—in order to give that corporation an opportunity to comply with the statutory provisions—*once the issue of the corporation's status has been raised by the defendant. York & York Construction Co. v. Alexander*, 296 A.2d 710, 713–14 (D.C.1972); *Hill-Lanham, Inc. v. Lightview Development Corp., supra*, 163 F.Supp. at 476; *Federal Loose Leaf Corp. v. Woodhouse Stationery Co., supra*, 163 F.Supp. at 483. However, "[u]nless an objection to a party's capacity to sue or defend is properly raised in the trial court, the issue is deemed waived throughout the proceedings." 18 FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 8629 (R. Eickhoff & R. Klaus ed. 1977).

Here, no objection to Synanon's maintenance of the instant suit on the ground that it could not sue on its contract because it had not obtained a certificate of authority was ever raised by the defendants. Even if it could be said that by focusing discovery on the question of Synanon's nonprofit status, the defendants constructively raised the question of the certificate of authority (assuming that no such certificate had ever been issued by the Mayor), the defendants' failure to raise this question in their answer or at some earlier stage of the proceedings constitutes a waiver of the issue. *Id.* § 8628 and cases cited.[12] Thus, the defendants would have been permitted to raise the for-profit status of Synanon as a defense to the complaint

only if Synanon had not obtained a certificate of authority and if they had raised this issue early in the proceedings. The defendants have not made a showing that either requirement was satisfied, however.

Whether a trial court has authority independent of the procedural requirements set forth in the statute to preclude a foreign nonprofit corporation from enjoying benefits accruing to nonprofit organizations in the District of Columbia need not be decided here. For even if the trial court in the course of this litigation had adjudicated Synanon a "for-profit" corporation, and thus not entitled to "nonprofit organization" status under the zoning regulations, that decision as to status could not be applied retroactively to void Synanon's contract with Bernstein. The fact that Synanon intended to use the Boston House for a purpose permitted only to nonprofit organizations under the zoning regulations does not in any sense transform its contract with Bernstein into one that is for an illegal purpose and therefore unenforceable. The basis of Synanon's bargain with Bernstein is the prospect of dual residential-office use of the Boston House, and the purchase price of the building reflects that understanding. Even if Synanon ultimately were to be adjudicated a for-profit organization, it would still be permitted to use the building for residential purposes, or it could lease or sell the building to an entity that would be allowed to maintain a business within it under the zoning laws.

Defendants apparently believe that based on the materials withheld by Synanon, the trial court would have held that Synanon may not be recognized as a nonprofit organization in the District of Columbia, and then the court could have applied this holding retroactively to the Boston House contract, making Synanon's contemplated use of that building illegal under the zoning law. Even if this reasoning process

---

**12.** That section provides, in part: "The defense that a foreign corporation is doing business in the state without qualifying is waived unless it is pleaded by the defendant at an early stage of the proceedings."

had merit, the defendants' post hoc allegation of illegality based on Synanon's status is not a defense to this action. For "it is settled that illegality constitutes no defense when merely collateral to the cause of action sued on" or when "the relation of the illegality to the relief sought is indirect and remote." *Loughran v. Loughran*, 292 U.S. 216, 228, 54 S.Ct. 684, 689, 78 L.Ed. 1219 (1934).[13]

## III

### Relevance in the Absence of a Nonprofit Issue

Finally, defendants argue that even if Synanon's nonprofit status was not at issue, the trial court properly exercised its discretion to dismiss based on the fact that the destroyed material was relevant to the defense raised to the complaint. I see no merit to this argument. The defendants argued in their answer that Synanon left the Boston House because it had received unfavorable publicity, because its leader had been involved in an altercation with a member of the news media outside the Boston House, and because it was not getting along with the Boston House tenants. It is farfetched to argue that Charles Dederich's opinions on vasectomies and on sex partners as expressed in his "Think Table" tapes—along with the great majority of material requested by defendants through discovery—has any bearing whatsoever on this defense. Moreover, as noted, the trial court's stated reason for dismissing the action was not that evidence relevant to this defense had been destroyed, but that the destroyed evidence was relevant to Synanon's nonprofit status—an issue that "inheres in the complaint [and] is inextrica-

bly involved in the entitlement of Synanon to recover."

## IV

### Conclusion

The trial court's dismissal of the complaint under Super.Ct.Civ.R. 37 was based almost entirely upon the destruction of materials relevant solely to Synanon's nonprofit status. Without findings of fact by the trial court that are focused on the question of the extent of the destruction of *relevant* material, I cannot find that the court properly exercised its discretion in dismissing the complaint on the basis of discovery abuse.

13. In *Loughran*, the Supreme Court considered an argument by a party defendant that recovery under a complaint should be forbidden where the plaintiff's status granted by another jurisdiction would not have been obtainable in the forum state, and the relief requested by the plaintiff could only be obtainable if its status was recognized by the forum. The defendant argued that the Constitution's full faith and credit clause does not require the courts of a given jurisdiction to recognize a public act or record of another jurisdiction which is contrary to the public policy of the State of the forum. The Court held that since the alleged illegality related only to the "status" of the plaintiff it was therefore collateral to the issues in the case, and the defendant was not permitted to raise or take advantage of the defense of illegality. As the *Loughran* Court noted, "[e]quity does not demand that its suitors shall have led blameless lives." *Id.* at 229, 54 S.Ct. at 689.