CHURCH OF SCIENTOLOGY INTERNA-
TIONAL, a California not for profit reli-
gious corporation, Plaintiff,

v.

ELI LILLY & COMPANY, an Indiana
corporation; Hill & Knowlton Inc., a
Delaware Corporation; Hill & Knowlton
Public Affairs Worldwide Company, a
Division of Hill & Knowlton, Inc.; WPP
Group, PLC, a United Kingdom Corpo-
ration; Martin S. Sorrell; J. Walter
Thompson Co., Inc., Defendants,

Hill & Knowlton Public Affairs
Worldwide Company,
Counter–Claimant,

Hill & Knowlton Inc., Counter–Claimant,

Church of Scientology International,
Counter–Defendant,

Hill & Knowlton Inc.; Hill & Knowlton
Public Affairs Worldwide Company;
WPP Group, PLC; Martin S. Sorrell; J.
Walter Thompson Co., Inc., Counter–
Claimants,

Church of Scientology International,
Counter–Defendant.

Civ. A. No. 92–1892(SS).

United States District Court,
District of Columbia.

March 21, 1994.

**1020**

Eric M. Lieberman, Hillary Richard, Laurie Edelstein, Thomas Viles, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C., New York City, Earle C. Cooley, Cooley, Manion, Moore & Jones, P.C., Boston, MA, Ronald Kenneth Mundy, Mundy, Holt & Mance, Anthony Patrick Bisceglie, Bisceglie & Walsh, Washington, DC, Kendrick Lichty Moxon, Bowles & Moxon, Hollywood, CA, for plaintiff.

Mark Butler Bierbower, Hunton & Williams, Washington, DC, Thomas G. Slater, Jr., Hunton & Williams, Richmond, VA, Theodore B. Olson, Theodore J. Boutrous, Jr., Gibson, Dunn & Crutcher, Washington, DC, Eric Mark Nelson, Howard J. Rubin, Douglas E. Thea, Lisa Paddock, Paul F. Corcoran, Davis & Gilbert, New York City, for defendants.

### MEMORANDUM OPINION AND ORDER

SPORKIN, District Judge.

This matter comes before the Court on Defendants' motions for summary judgment.

### I. Background

The plaintiff in this action is the Church of Scientology, Incorporated ("CSI"). CSI is the "mother church" of the Scientology religion.[1] This lawsuit stems from the termination of a contract between CSI and defendant and counterclaim plaintiff Hill & Knowlton, Inc. and its unit, Hill & Knowlton Public Affairs World Wide Company (together "H & K").

H & K is a public relations firm. H & K is also a wholly-owned subsidiary of Defendant WPP Group, plc., a British public limited company ("WPP"). Defendant J. Walter Thompson Company, Incorporated ("JWT") is an advertising agency that is also a wholly-owned subsidiary of WPP. Thus, H & K and JWT are subsidiary corporations, 100 percent-owned by parent WPP. Defendant Martin S. Sorrell is a British citizen, occupying the positions of director and Group chief executive at WPP. Defendant Eli Lilly and Company ("Lilly") is an international pharmaceutical company and the maker of the antidepressant drug Prozac. Lilly has been a client of JWT for more than twenty-three years. From 1983 to 1990, Lilly was also a client of H & K in the United Kingdom. Beginning in 1987, H & K entered into a contract to provide CSI with public relations services.

The instability of the CSI–H & K and JWT–Lilly alliances became apparent in late 1989 when CSI launched a highly effective nationwide media crusade against the drug Prozac and its manufacturer Lilly. Lilly learned of H & K's representation of CSI and over a period of time conveyed to JWT and WPP its intention to sever its ties to WPP. Fearing the loss of valued clients, WPP director Sorrell insisted that H & K terminate its representation of CSI. Notification of termination occurred only days after the publication of a *TIME* magazine cover story, highly critical of CSI. *See* Richard Behar, *Scientology, The Thriving Cult of Greed and Power*, TIME, May 6, 1991 at 32–39.

CSI alleges that its contract for public relations services was unlawfully terminated by H & K due to tortious interference by Lilly, JWT, WPP, and Sorrell. CSI claims that as a result of this unlawful termination, it was deprived of valuable public relations

---

1. According to a publication of the Church of Scientology, entitled *What is Scientology*, "Scientology is a twentieth century religion", founded by L. Ron Hubbard in the 1950s. Scientology espouses a philosophy of self-improvement. Among Scientology's fundamental truths is that "Man is a spiritual being endowed with abilities well beyond those which he normally envisages. He is not only able to solve his own problems, accomplish his goals and gain lasting happiness, but also achieve new states of awareness he may never have dreamed possible." *What is Scientology* at 141, Lilly Reply Ex. C.

services "at a time when it had just sustained a malicious and derogatory assault at the hands of *TIME* magazine and was in immediate need of the services of Hill & Knowlton whose expertise in Church matters had been purchased at great expense over the previous 2 and ½ years." Second Amended Complaint ¶ 49 at 16.

CSI has sued on a number of grounds requesting more than $4.7 million in compensatory damages and $10 million in punitive damages. Count One of the Second Amended Complaint alleges breach of contract against H &.K. Count Two alleges breach of fiduciary duties against H & K. Count Three alleges inducement of breach of contract against WPP, JWT, Sorrell, and Lilly. Count Four alleges intentional interference with business relations against Defendants WPP, JWT, Sorrell, Lilly, and H & K. H & K has filed a counterclaim for public relations services rendered to CSI for which H & K has not received payment. H & K claims it is due $333,216.30. This Court has jurisdiction under 28 U.S.C. § 1332.

## II. Summary Judgment Standards

All defendants have moved for summary judgment and counterclaim plaintiff H & K has moved for summary judgment on the counterclaim. Under Federal Rule of Civil Procedure 56, summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.Proc. 56(c). Mere allegations or denials of the adverse party's pleading are not enough to prevent the issuance of summary judgment. The adverse party's opposition must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.Pro. 56(e).

The governing standards for the issuance of summary judgment were set by the Supreme Court in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In *Celotex*, the Court explicitly recognized that a full-blown trial is a drain on resources to be avoided if and when the non-moving party's position cannot be substantiated through affidavit or other competent means

> . Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis. .

*Id.* at 327, 106 S.Ct. at 2555. (citation omitted). This said, all reasonable inferences from the evidence are to be drawn in the non-moving party's favor and therefore, plaintiff's "version of any disputed issue of fact thus is presumed correct." *Eastman Kodak Co v. Image Technical Services, Inc.*, —— U.S. ——, ——, 112 S.Ct. 2072, 2077, 119 L.Ed.2d 265 (1992).

## III. The Evidence:

The following gives an overview of the thousands of pages of evidence submitted by the parties in the form of documents, affidavits, and depositions. This evidence must be viewed in the light most favorable to CSI.

### a. The Contracts

In the fall of 1987, senior officials at CSI and the affiliated Religious Technology Center ("RTC") became concerned with how Scientology was perceived by the public and portrayed in the media. On the advice of counsel, CSI decided to investigate the possibility of retaining a public relations firm. A series of meetings took place in Washington D.C. between CSI officials and H & K and its worldwide chairman, Robert Gray. According to the declaration of David Miscavige, who is Chairman of the Board of Directors of the RTC and the most senior official of Scientology, Gray requested and the CSI provided extensive briefing and background materials to H & K to permit H & K to determine whether or not H & K could be of service to CSI. CSI Ex. 1. After a review of these documents, H & K agreed to represent CSI.

A letter of agreement dated December 1, 1987 ("Contract I") was sent by Robert Gray to CSI President, Heber Jentzsch. Jentzsch signed this agreement on December 7, 1987. The relevant provisions of Contract I are as follows. H & K agreed to provide CSI with a communications program which would have "both short and long-term objectives" including:

- Neutralize negative media coverage; seek a change in the direction of media coverage by building a new and positive public platform for the Church; and promote the many positive aspects of scientology (programs, individual success stories, societal benefits);
- Expand new membership and increase solidarity among existing membership.

CSI Ex. 37 at 1. H & K agreed to work toward these goals by performing sophisticated public attitude research, conducting an inventory of CSI's internal resources, providing media training for all those who represent CSI in public, and doing a materials audit of the books, pamphlets, and press kit literature that CSI was providing to the media. H & K also agreed to establish a comprehensive communications program and "to be available as counsel on all communications matters related to the Church, whether the nature of concerns be routine or crisis." *Id.* at 1–3.

H & K noted in the agreement that its policy was to assist controversial clients even though such representation would necessarily result in loss of business for H & K. As the letter of agreement stated:

Because it is the oldest and largest communications firm in the world, Hill and Knowlton is accustomed to being dealt the toughest of communications challenges. Often is the case that principled clients conducting honest operations toward laudable and legitimate ends come to us when they are much misunderstood and maligned in the marketplace. We believe these clients deserve the best, most reputable counsel and are willing to commit our reputations and credibility toward that effort. Nevertheless, in doing so we know we risk both the loss of clients and potential clients as we commit the full resources of our firm worldwide. *The policy of this firm is to balance the impact of our association with the Church of Scientology, and to compensate the firm for business or professional loss which unfairly but predictably attends our relationship.* We will undertake to represent the Church with the same terms applicable to other highly controversial clients.

An advance entry retainer in the amount of $50,000 will be required at the onset of our relationship. In addition, a monthly retainer of $5,000 will be required, to which will be added charges for staff services provided to the Church. These charges will be levied at standard hourly rates for participating officers and staff assistants as required to carry out programs and activities approved by you.

CSI Ex. 37 at 4 (emphasis added). There is evidence that the $50,000 fee and $5,000 monthly retainer (payments against which no actual H & K services were performed) were non-refundable premiums paid by CSI because of its perceived controversial reputation. *See* CSI Ex. 7 at 78–79. There is also evidence that CSI, on the basis of oral statements made by H & K officials, understood these premiums were to be in consideration for H & K's guarantee that CSI would not be abandoned because of pressure by other H & K clients. *See* CSI Ex. 1 at 4.

While CSI provides evidence via declarations and deposition testimony of its understanding as to H & K's "guarantee" of non-abandonment in the face of pressure from other H & K clients, Contract I on its face makes no explicit mention of any "guarantee". Instead, Contract I includes an integration clause as well as a provision covering the agreement's termination:

H & K's appointment under this arrangement is to extend from November 30, 1987 to February 15, 1987 [sic] at which point either party may cancel the agreement. If both parties agree to renew the agreement, it will continue indefinitely unless either party gives sixty (60) days' written notice of its desire to terminate or modify the agreement.

This agreement represents the entire agreement of the parties and may be

amended only by a writing signed by all parties. It shall be governed and construed in accordance with the laws of the District of Columbia.

CSI Ex. 37 at 5–6.

Pursuant to Contract I, H & K conducted a study of CSI with the assistance of a public opinion research firm. H & K analyzed CSI documents provided to H & K by CSI. H & K staff members met with CSI officials on multiple occasions. The study period established under Contract I endured for nine months during which time CSI paid, in addition to hourly staff charges, a total of $90,000 pursuant to the "controversy premium" provision in Contract I. No H & K work was billed against the $90,000.

H & K entered into a second agreement with CSI via a letter sent by Gray to Jentzsch on August 12, 1988 ("Contract II"). CSI Ex. 39. This second letter of agreement noted that having conducted a "thorough study" of CSI over nine months, H & K was prepared to move forward with the ideas and concepts H & K had developed to assist CSI. "As we begin this phase, there is a need to revise our current working relationship," wrote Gray. CSI Ex. 39 at 1.

The new agreement was specifically intended to supersede Contract I: "The letter of agreement signed in December, 1987 covered activity through the delivery of our proposal on Tuesday. This letter of agreement will supersede that contract." *Id.* Under the new contract, H & K agreed to develop a number of specific projects as well as to provide CSI with ongoing services:

> *Ongoing Counsel*—Hill and Knowlton will continue to provide Church of Scientology with ongoing public relations and public affairs counsel for all those activities on which we now are working. In addition to the development and implementation of the specific projects outlined above, Hill and Knowlton staff will be available to provide Church of Scientology with regular and continuing communications counsel.

CSI Ex. 39 at 2. Although there is no mention in Contract II of any "controversy premium" payments, the "Billings" section of Contract II makes clear that CSI was ex-

pected to expend a minimum of $25,000 monthly on H & K services:

> Charges for the services of H & K will be made at standard hourly rates for participating officers and staff assistants as they are required to carry out the programs and activities approved. On a monthly basis, Church of Scientology will pay H & K a minimum of $25,000 in advance, for services rendered under this agreement. Staff time charges incurred in any month for the Church of Scientology account will be applied against this minimum, and any staff time charges incurred above the minimum will be billed at regular rates.

*Id.* at 3.

CSI provides evidence through depositions and declarations that the minimum monthly billing of $25,000 was intended to be the equivalent of the "controversy premium" payments found in Contract I. CSI Ex. 1 at 5. CSI argues that it had secured, through premium payments over the course of Contract I, and by agreeing to the $25,000 minimum monthly payments in Contract II, H & K's promise not to terminate the CSI relationship due to pressure from other clients.

Contract II, like Contract I before it, makes no mention of any specific agreement by H & K not to terminate CSI due to pressure from other clients. Contract II does states that the Contract will continue indefinitely unless either party gives 60 days written notice of its desire to terminate the agreement:

> *Length of Contract*—Hill and Knowlton's appointment under this agreement will extend for one year from August 1, 1988 through July 31, 1989, at which point either party may cancel the agreement. If both parties agree to renew the agreement, *it will continue indefinitely unless either party gives sixty days (60) advance written notice of its desire to terminate the agreement.*

CSI Ex. 39 at 3 (emphasis added). Contract II also contains the same integration provision found in Contract I, assuring that the written letter of agreement would represent "the entire agreement of the parties" to be

amended only by a writing signed by both of the parties. *Id.* at 4.

Over the course of the next two and one half years, H & K provided substantial public relations services to CSI, for which CSI eventually paid H & K $4.7 million. Both parties appeared to be perfectly satisfied with the way the contract was being performed.

### b. Eli Lilly and Prozac:

In February 1988, Lilly began to produce and distribute the drug Prozac, an FDA-approved prescription medication, used for the treatment of depression. Lilly had been for 23 years exclusively represented by advertising firm JWT. Lilly Ex. 2. On a small scale, Lilly had also been a client of H & K's operation in the United Kingdom since 1983. Lilly Ex. 4. Both H & K and JWT were 100% owned by their common parent, WPP, under the leadership of Martin Sorrell. Lilly Ex. 6, 7.

CSI has long held antipathy for psychiatric treatment in general and the use of medication to treat certain psychological disorders in particular.[2] Beginning in late 1989, CSI and a CSI sub-organization called the Citizens Commission on Human Rights ("CCHR")[3], began a nationwide publicity campaign attacking Lilly and the drug Prozac. The anti-Prozac campaign was conducted through CSI-related publications, CCHR press releases, appeals by CSI and CCHR officials to members of Congress, and via CCHR spokespersons' appearances on radio and television shows, including such television programs as *Geraldo, The Phil Donahue Show,* and *Larry King Live.* The substance of the message conveyed in the CSI and CCHR attacks was that Prozac is a deadly drug that may lead Prozac patients to commit mass murder and suicide.

Prozac is a valuable source of revenue for Lilly. It is undisputed that CSI's campaign against Prozac and Lilly has had a deleterious effect both on sales of Prozac and on Lilly's stock price. *See* Second Amended Complaint ¶ 34; Lilly Ex. 1. There is evidence that some H & K resources were used to support CSI in its publicity campaign against Prozac. CSI Ex. 35.

Lilly argues that to the extent H & K provided assistance to CSI in improving CSI's image with the public, H & K was indirectly assisting in CSI's campaign against Prozac. The interests of CSI and Lilly were at odds with one another. The evidence supports a conclusion that WPP assets, namely the resources of public relations firm H & K and the advertising firm JWT, were acting at cross-purposes, the former on behalf of CSI and the latter on behalf of Lilly. The evidence supports a conclusion that H & K was attempting to bolster CSI's reputation and was providing indirect support for CSI's anti-Lilly, anti-Prozac campaign, while JWT was working to increase sales of Lilly's products.

Lilly's contract with JWT contained the following provision:

> **Exclusive Representation:** The Agency shall not, without consultation and prior approval of Lilly's Vice President of Marketing, act as advertising agent or provide a service similar to the service provided under this Agreement with respect to similar or competitive products of other manufacturers, suppliers, distributors, or advertisers other than Lilly divisions, subsidiaries or affiliates.

Lilly Reply Ex. A. Despite this provision, Lilly tolerated H & K's representation of competing pharmaceutical products. For example, H & K in the United Kingdom represented SmithKline Beecham's Seroxat, an anti-depressant which competes directly with Prozac. CSI Ex. 61.

In the summer of 1990, Lilly made known to WPP and JWT that it was displeased with the connection between CSI and H & K. Aware of this pressure, Robert Gray, H & K's top executive working directly with CSI,

---

**2.** A document entitled "Public Warning on Psychiatry", written by the founder of Scientology, L. Ron Hubbard, has been adopted by CSI as part of the religion's ecclesiastical policy. Lilly Ex. 32 & 33.

**3.** CCHR is an international organization established by CSI in 1969 to "investigate and expose psychiatric violations of human rights." Lilly Ex. 1 at 2.

prepared drafts of a letter for H & K CEO Dilenschneider to send to Martin Sorrell. The letter drafts outlined H & K's opposition to dropping CSI and explained the nature of the relationship:

> In the two years (two and one-half including the study period) we have worked for CSI, its principals patiently have taught us the intricacies of their religion and their worldwide efforts to promote it, have been quick to seek and heed our counsel, have shared confidences, have been honest in their dealings, reasonable in their expectations and grateful for the progress we have made toward better public appreciation of their mission substantiated by independent tracking polls.
>
> In the combined experience of your professionals on our board, Martin, no client ever has invested more to justify representation by Hill & Knowlton. This we believe is the compelling reason it would professionally be unconscionable to desert them now over a non-germane issue involving a non-client of this firm.

CSI Ex. 49. A later draft added the following paragraph:

> No client ever has invested more to justify H & K representation. If we walk away from Scientology now, I fear the client, with some justification, may demand return of that six-month study money (get amount) plus other they attribute to the costs of bringing us up to speed on their mission and their problems.

CSI Ex. 50.

In late August of 1990, WPP's chairman, Martin Sorrell met with Lilly official Eugene Step to address Lilly's concerns. Lilly informed JWT and WPP that due to the perceived conflict between H & K's representation of CSI and JWT's representation of Lilly, Lilly would pull its business with WPP companies if the H & K work for Scientology continued. Lilly Mo. for S.J. at 13. At this meeting, Sorrell explained to Step the structure of the WPP family of companies, trying to make it clear that WPP was merely a holding company and that the subsidiaries were entirely independent. Sorrell also noted that H & K was doing no direct work on the Prozac campaign. Apparently, Step was unconvinced, and Sorrell departed the meeting with the words "Leave this in my hands, I'll take care of it." CSI Ex. 52. CSI characterizes this as an agreement by Sorrell to wind down and terminate the H & K relationship. CSI Brief at 16. Over a period of time, Sorrell conveyed to H & K CEO Robert Dilenschneider that he (Sorrell) "felt the church was not right for the Hill and Knowlton client roster." CSI ex. 18 at 68.

In November 1990, Lilly severed all of its links with H & K in the United Kingdom, terminating a $160,000 account explicitly due to H & K's representation of CSI. *See* H & K Ex. 80, 82. CSI characterizes this move as an additional step by Lilly to increase the pressure on WPP to drop the CSI account. In December 1990, Lilly told JWT that it might pull its advertising account at any time due to lack of action by WPP to address the Scientology representation. Lilly Ex. 61. In late January 1991, Lilly again told JWT it was watching and waiting for action on the Scientology matter. Lilly Ex. 62. In March 1991, after a "lengthy and negative anti-Prozac segment" on the Phil Donahue television show, Lilly again expressed its concern to JWT about H & K's Scientology representation. One of the participants on the show was CSI's chief spokesman on Prozac. *See* Lilly Ex. 63. In April 1991, Lilly again expressed its concern to JWT about the CSI issue. These views were transmitted by JWT officials to Martin Sorrell. One JWT official characterized Lilly's feelings about CSI as: "it will be all out war and anyone associating with the enemy [CSI] will be dealt with accordingly." Lilly Ex. 69.

Over this period of time, Sorrell increased his pressure on H & K to terminate the H & K–CSI relationship. H & K CEO Dilenschneider described this as "enormous pressure" resulting from "telephone calls and personal meetings of increasing velocity about whether or not the church should be on [H & K's] roster." CSI Ex. 18 at 72–73. Dilenschneider believed the "increasing velocity" of Sorrell's demands to be due to Lilly requests.

*c. Other Pressures to Drop CSI as Client*

While Lilly expressed its concerns about H & K's representation of CSI to JWT and

WPP, other members of the WPP corporate family were actively opposing H & K's representation of CSI. In November 1990, H & K's Europe CEO, David Wynne–Morgan wrote a number of memoranda to H & K in the United States warning that the H & K–CSI link was threatening all of H & K's european pharmaceutical business. In addition, Wynne–Morgan noted that many H & K european employees were unwilling to work on CSI projects. *See* Lilly Ex. 48.

Other pharmaceutical companies were refusing to do business with H & K because of the CSI link. H & K was "blackballed" from pitching all business for the pharmaceutical firm Ciba–Geigy, including a million-dollar european arthritis drug account. Lilly Ex. 49.

In April 1991, SmithKline Beecham hired H & K to handle a multi-million dollar account in the United States for the promotion of a new anti-depressant, Aropax. Lilly Ex. 71.[4] On April 28, 1991, *TIME* magazine published the cover story entitled "Scientology—the Thriving Cult of Greed and Power." Lilly Ex. 70. The article was highly critical of CSI.[5] It described CSI's campaign against Prozac and also noted that CSI had retained H & K for assistance in improving its image. Within days of publication of the *TIME* article, SmithKline fired H & K from the newly-awarded Aropax account on the basis of the H & K's representation of CSI. Lilly Ex. 72.

## IV. Termination

On April 30, 1991, H & K CEO Dilenschneider wrote WPP Chairman Sorrell that H & K would be resigning the CSI account within the terms of the contract. Lilly Ex. 74. Dilenschneider did this even though he believed strongly that H & K should not have walked away from CSI. CSI Ex. 18 at 156. On May 1, 1991 H & K Worldwide Chief Robert Gray called CSI lawyer Gerald Feffer to explain that H & K would be resigning the CSI account. Lilly Ex. 75. There is evidence that Gray did not want to terminate the H & K relationship with CSI, and Gray did so only at the insistence of Sorrell. CSI Ex. 18 at 76–78. On May 3, 1991, Lilly, told JWT that it would be dropping its advertising account. Lilly Ex. 77. The same day, WPP CEO Sorrell responded to Lilly that the Scientology account had already been terminated. Lilly Ex. 78.

## V. Choice of Law:

■ As an initial matter, it should be noted that District of Columbia law applies to this dispute. This lawsuit was originally filed in California and was transferred to the District of Columbia. Two of the defendants, WPP and Martin Sorrell, are not subject to personal jurisdiction in California. WPP does not do business in California and CSI's claims against Sorrell are based solely on his acts as WPP's chief executive. All the events which give rise to CSI's claims against WPP and Sorrell occurred outside of California. The California court lacked personal jurisdiction over Sorrell and WPP. *See Congoleum Corp. v. DLW Aktiengesellschaft*, 729 F.2d 1240 (9th Cir.1984) (no personal jurisdiction where cause of action asserted lacks any relation to the contact of the defendant with the putative forum state). Thus, California was never a proper venue to begin with. *See* 28 U.S.C. § 1391(a). So, while this Court is a transferee court, District of Columbia choice of law rules must apply. *See Davis v. Costa–Gravas*, 580 F.Supp. 1082, 1086–87 (S.D.N.Y.1984) (where venue is improper in transferor court, choice of law rules of transferee court must apply).

■ Under the District of Columbia's choice of law rules, the law governing the claim is to be the law of the state with the most significant relationship to the matters at issue. *Hitchcock v. United States*, 665 F.2d 354, 360–61 (D.C.Cir.1981). The District of Columbia is the jurisdiction with the most significant relationship to the matters at issue. The document which was the basis for the relationship between CSI and H & K

---

**4.** Aropax is the name in the United States for the anti-depressant called Seroxat in the United Kingdom.

**5.** This article has itself been the basis for a CSI libel suit against *Time*. *See Church of Scientology, International v. Time Warner, Inc.* 806 F.Supp. 1157 (S.D.N.Y.1992).

is a contract which states specifically that it shall be interpreted in accordance with the laws of the District of Columbia. *See* CSI Ex. 37 at 6. The contract was negotiated, drafted, and for the most part executed in the District of Columbia.

## VI. The Counts

### a. Breach of Contract

■ The breach of contract cause of action poses a number of difficult issues. The contract states: "it will continue indefinitely unless either party gives sixty days (60) advance written notice of its desire to terminate the contract."

H & K claims it terminated the contract pursuant to its terms. The fact is H & K did not give "advance written notice." Conceding this point, H & K argues that the case law recognizes that oral notice is acceptable where it can be proven by clear and convincing evidence. CSI counters that H & K unilaterally curtailed its contractual activities prior to the termination date at a point in time when CSI claims H & K's services were urgently needed. CSI also claims that the underlying intent of the parties was that the contract would continue indefinitely so long as both parties were living up to their end of the long standing relationship.

There are facts in the record from which a fact finder could make the following findings:

1. CSI was an excellent client that did everything that H & K demanded of it.
2. Based upon its prior contractual relationship with H & K, CSI's legitimate expectations were that the contract would continue so long as it remained a good client.
3. CSI had the legitimate expectation that its relationship with H & K would not be summarily terminated particularly at a time when it was having difficulty and was in particular need of H & K's services.
4. H & K knew that CSI was relying on its services and would be placed in a difficult position by a peremptory termination of the contract.
5. Because CSI believed its contract with H & K would continue indefinitely and was given no cause to believe there would be a peremptory strike by H & K, CSI had made no contingency plans to obtain substitute public relations counsel.

Against this background, the Court finds it must deny H & K's summary judgment claim on this issue.

### b. Breach of Fiduciary Duty against H & K

■ H & K argues that this count must be dismissed because, as a matter of law, there can be no fiduciary relationship between a public relations firm and its client. H & K characterizes the relationship between itself and CSI as an arms length contractual agreement. In addition, H & K asserts that it cannot be held accountable for a breach of fiduciary duty when it has simply terminated a contractual relationship within the terms of the contract. H & K argues that even if it were a fiduciary, there is no evidence that it breached its duty to the Church.

There is evidence that during H & K's representation of CSI, H & K's advice to CSI was distorted because of its strong ties to the pharmaceutical industry. For example, a letter from H & K Europe's CEO to H & K in the United States suggests that H & K had other interests besides CSI's interests in mind when it was giving CSI advice:

> "I know that Bob Gray believes that if Hill & Knowlton were not working for the Church of Scientology, then the stance of the Church against the drug industry would be infinitely stronger.
>
> . . . . .
>
> If we believe that we are reducing the position of the Church against the pharmaceutical industry by our actions, then it is absolutely essential that we succeed in persuading the pharmaceutical industry that it is in the interest of the industry that we should continue working for them."

Lilly Ex. 48 (Letter from David Wynne–Morgan (H & K Europe) to Tom Edison (H & K New York) November 26, 1990.). There is other evidence that CSI's trust in H & K was not well-placed. An H & K employee in Washington drafted an internal memorandum, dated January 16, 1991, for the benefit

of SmithKline Beecham. This memorandum explained CSI's opposition to psychiatric drugs and recommended a "preparedness" strategy in the event that CSI began a campaign against SmithKline's anti-depressant Seroxat. CSI Ex. 91.[6]

The Restatement (Second) of Torts notes that a fiduciary relation exists when one party "is under a duty to act for or give advice for the benefit of another upon matters within the scope of the relation." Restatement (Second) Torts § 874, *comment a.* To the extent that H & K held itself out to CSI as knowledgeable in the area of public relations and promised to provide CSI with "ongoing public relations and public affairs counsel", CSI Ex. 39 at 2, H & K appears to fit within the Restatement's broad definition of a fiduciary.

■ It well may be that no Court has ever found there to be a fiduciary relationship between a public relations firm and one of its clients. But whether there exists a fiduciary relationship is a fact-intensive question, involving a searching inquiry into the nature of the relationship, the promises made, the type of services or advice given and the legitimate expectations of the parties. A case from the Southern District of New York describes the outer limits of the fiduciary concept:

"Broadly stated, a fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another. It is said that the relationship exists in all cases in which influence has been acquired and betrayed. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in, and relies upon, another...."

*Schmidt v. Bishop,* 779 F.Supp. 321, 325 (S.D.N.Y.1991) (quoting *Penato v. George,* 52 A.D.2d 939, 383 N.Y.S.2d 900, 902 (2d Dep't N.Y.1976), *appeal dismissed,* 42 N.Y.2d 908, 397 N.Y.S.2d 1004, 366 N.E.2d 1358 (1977)) (citing Restatement (2d) Torts § 874, comment a).

In another case from the Southern District, the Court noted that while normally a fiduciary duty would not arise from a straightforward contractual arrangement, a fiduciary relationship could exist under certain circumstances. For example, such a relationship might exist between a boxing promoter and his boxer, if the boxer could demonstrate that the promoter had violated "the very limited tissue of trust a fighter reasonably reposes in a promoter". *Don King Productions, Inc. v. Douglas,* 742 F.Supp. 741, 769 (S.D.N.Y.1990). The existence of a fiduciary relationship would depend on whether the parties, through the past history of the relationship and their conduct, had extended the relationship beyond the limits of the contractual obligations. *Id.* at 770.

Given the record as it currently stands, the Court is unwilling to grant summary judgment on this count at this time. Viewing the evidence in the light most favorable to CSI, there is adequate evidence in the record to support CSI's claim that its relationship with H & K was one of great sensitivity, based on trust and confidence and that H & K breached the relationship that had been established. Particularly, there is evidence that H & K betrayed this trust by compromising its representation of CSI for the benefit of WPP's bottom line, and by giving advice to others to be specifically used against CSI's interests.

*c. Inducement of Breach (Count 3) and Intentional Interference with Business Relations (Count 4)*

1. *Hill and Knowlton*

■ Count Four must be dismissed with regard to H & K. *See Press v. Howard University,* 540 A.2d 733, 736 (D.C.App.1988) (suggesting that it borders on frivolous to argue that a party through its own actions could tortiously interfere with its own contract); *See also Newman v. Legal Services Corp.,* 628 F.Supp. 535, 541 (D.D.C.1986) (interference must be with contract between plaintiff and a third party); *Donohoe v. Watt,*

---

**6.** While this memorandum was never sent to SmithKline, some of the tactics suggested therein were conveyed to SmithKline. See CSI Ex. 36. The author of this memorandum testified that all the information about the Church came from his own personal experience and did not come from H & K's account with CSI.

546 F.Supp. 753, 757 (D.D.C.1982), *aff'd*, 713 F.2d 864 (D.C.Cir.1983) ("A defendant's conduct under his own contract with the plaintiff ... cannot support an action for interference with it.").

### 2. *Lilly*

 Lilly moves to dismiss these Counts on the ground that it was privileged to demand performance of the exclusivity clause of its contract with JWT. In addition, Lilly asserts it was privileged to act as it did under the "competitor's privilege" because CSI, through its "Dianetics" mental health treatment system was in actual competition with Lilly. Lilly also argues that its actions, at worst, could be described as a refusal to deal, and there is no evidence that Lilly attempted to improperly influence JWT and WPP.

As to Lilly, the Court believes that there exist genuine issues of fact as to whether the actions taken by Lilly were proper. For purposes of its motion for summary judgment, Lilly characterizes its position to JWT and WPP as "it's us or them". Lilly reply at 7. Lilly asserts that it made no effort to pressure JWT or H & K; it merely announced its intentions. Lilly calls this action "reasonable" given the perceived conflict of interest. There is evidence supporting this characterization of Lilly's conduct, including internal JWT memoranda that indicated the decision to terminate was up to JWT and WPP, and that Lilly would not presume to tell WPP how to run its business. *See e.g.,* Lilly Ex. 55, 56.

Yet, there is also evidence in the record contradicting Lilly's characterization. The evidence could support the conclusion that Lilly, rather than simply presenting JWT and WPP with a choice, exerted increasing economic pressure on H & K, through JWT and WPP, to drop CSI as a client. For example, a Lilly spokesman was quoted as saying, "We told [Sorrell] we found it intolerable to do business with people who do business with the ilk of Scientology." Lilly Ex. 59. A draft letter from H & K CEO Robert Dilenschneider to Martin Sorrell (written by Robert Gray), referred to Lilly's pressure on JWT and WPP as "client blackmail". CSI Ex. 49.

There is a fine line between a simple refusal to deal and unlawful economic pressure intended to inflict harm on an adversary. The Restatement (Second) of Torts illustrates the difficulty of distinguishing between a simple refusal to deal and improper coercion:

1. Upon hearing of B's contract with C, A ceases to buy from B. When asked by B to explain his conduct, A replies that his reason is B's contract with C. Thereupon B breaks his contract with C in order to regain A's business. A has not induced the breach and is not subject to liability to C under the rule stated in this section.

2. Upon hearing of B's contract with C, A writes to B as follows: "I cannot tolerate your contract with C. You must call it off. I am sure that our continued relations will more than compensate you for any payment you may have to make to C. If you do not advise me within ten days that your contract with C is at an end, you may never expect further business from me." Thereupon B breaks his contract with C. A has induced the breach and is subject to liability under the rule stated in this section.

Restatement (Second) of Torts § 766 *comment l.* The difference between these two examples is explained as the difference between a simple refusal to deal and the actionable use of the refusal to deal as "a means of affirmative inducement, compulsion or pressure" to terminate an ongoing relationship. *Id.* The question as to whether Lilly's conduct went beyond a mere refusal to deal is first for the trier of fact to determine.

As to the question of whether CSI with its Dianetics program was in actual competition with Lilly's anti-depressant Prozac, here too are genuine issues of fact for the jury. It is not clear from the submitted papers exactly how the Dianetics treatment is used and to what extent Scientology actively markets its faith and ideology as a drug-free remedy to clinical depression. The Court will follow the recommendation of the Restatement:

[W]hen there is room for different views, the determination of whether the interfer-

ence was improper or not is ordinarily left to the jury to obtain its common feel for the state of community mores and for the manner in which they would operate upon the facts in question.

Restatement (Second) Torts, § 767 *comment l.* The Court believes that there are enough genuine issues of material fact as to whether Lilly's interference was justified to allow this claim to go to the jury.

### 3. *Sorrell and WPP*

■ Sorrell, and WPP also move to dismiss on the ground that their actions in influencing H & K to terminate the contract were privileged. These defendants cite the Restatement (Second) of Torts § 769 which suggests that a party with a financial interest in a contract would be privileged to influence or interfere with the continuation of that contract. Comment c of Restatement § 769 seems to suggest that the owner of a concern would be entitled to interfere with his company's contracts:

> The financial interest in another's business requisite for the rule stated in this section is an interest in the nature of an investment. A part owner of a business, as for example, a partner or stockholder, has at least an interest of this nature. A bondholder or other creditor may also have it.

Restatement (Second) of Torts § 769 *comment c.* In a case which seems to adopt this reasoning, the Second Circuit found that a corporate parent could influence a subsidiary to terminate a contract without subjecting the corporate parent to liability for interference. *See American Protein Corp. v. AB Volvo,* 844 F.2d 56, 63 (2nd Cir.1988). Similarly, the 3rd Circuit has found that a parent corporation could influence a wholly-owned subsidiary not to sign a lease without being subject to liability from the prospective lessor. *Green v. Interstate United Management Service Corp.,* 748 F.2d 827 (3rd Cir. 1984). There are also cases from the District of Columbia which recognize the privilege to interfere of one who has a financial interest in a prospective contract. *See Brown v. Carr,* 503 A.2d 1241, 1247 (D.C.App.1986); *Zoby v. American Fidelity Co.,* 242 F.2d 76, 79–80 (4th Cir.1957).

WPP and Sorrell place substantial reliance on *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). In *Copperweld,* the Supreme Court concluded that it would be impossible for a corporate parent and its wholly-owned subsidiary to conspire for antitrust purposes. This is because, the Court found,

> "[a] parent and its wholly-owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate conciousnesses, but one. They are not unlike a multiple team of horses drawing a vehicle under the control of a single driver."

*Copperweld,* 467 U.S. 752, 771, 104 S.Ct. 2731, 2741–42, 81 L.Ed.2d 628 (1984). WPP and Sorrell argue that this passage, supported by other cases, means that under the circumstances of this case, owner corporations, parent company officers, and corporate subsidiaries should be able to influence the decisions of other corporate entities within the same family of corporations without incurring liability for interference.

At this stage of the litigation, the Court is unconvinced. While recognizing the cited authority, the Court believes that it would be premature to dismiss Sorrell and WPP from this lawsuit at this time. This case presents the circumstance of H & K being ordered by its corporate parent to drop a client. This was done against H & K's will and cost H & K a multi-million dollar client. What is significant here is the allegation that the corporate parent was encouraged to issue this order at the insistence of an outside actor—Lilly. In other words, the evidence is that the decision to influence H & K to terminate the CSI relationship was not generated internally within the WPP family. There is evidence that Sorrell, WPP and JWT conspired with Lilly, an outside actor, to plot the termination of an arrangement that was otherwise mutually satisfactory to H & K and CSI. This distinction, the Court believes, differentiates this case from those cited by defense counsel.

■ What is more, in the instant case the two corporations in conflict, while related and

wholly owned by WPP, are very substantial corporations with dominant positions in their respective industries. From the record, it appears they act independently of one another and serve clients with conflicting interests. In view of their fierce independent nature and the fact they are organized and operated as separate corporate entities, to treat them as one would undermine the concept of the corporate structure acting as a "fire wall." It is rare, indeed, in this Court's experience for a corporate complex to want to pierce its own corporate veil. As separate corporate entities, they must be held fully and strictly accountable for their own actions.

*4. JWT*

 JWT, in addition to adopting the arguments posited by Sorrell and WPP, defends on the basis that it was only communicating truthful information to its corporate parent about the potential loss of business. It is true that this Court has twice before cited the Restatement of Torts and denied claims of tortious interference where the allegedly tortious acts involved conveying truthful information. *See Weiss v. Lehman,* 713 F.Supp. 489, 503 (D.D.C.1989) (citing Restatement (Second) Torts § 772); *International City Management Ass'n Retirement corp. v. Watkins,* 726 F.Supp. 1, 6 (D.D.C. 1989) (same). Yet, in this case there is evidence that JWT did more than simply convey truthful information. The evidence supports the conclusion that JWT may have colluded with Lilly and WPP to achieve the termination of the H & K–CSI contract.

*VII. H & K's Counterclaim*

The Court will defer ruling on the counterclaim. This cause of action in large measure depends upon disposition of CSI's various claims. Accordingly, summary judgment will be denied on to H & K. It may later renew its motion at a more propitious stage of the proceeding.

*VIII. Conclusion*

Defendants' motions for summary judgment will be denied with the exception that summary judgment will be granted in favor of H & K with respect to Count Four alleg-ing its intentional interference with its own business relations with CSI. H & K's motion on the counterclaim will be denied without prejudice. This case will proceed to trial. An appropriate order accompanies this opinion.

### ORDER

Having considered Defendants' motions for Summary Judgment, Plaintiff's opposition thereto, and heard argument by the parties, it is hereby

**ORDERED** that the motion for summary judgment of Defendants Hill and Knowlton, Inc., WPP Group, PLC, Martin S. Sorrell, and J. Walter Thompson Co., Inc. be denied except to the extent that summary judgment be granted in favor of Defendant Hill and Knowlton, Inc. on Count Four of the Second Amended Complaint; and it is further

**ORDERED** that the motion for Summary Judgment of Defendant Eli Lilly & Co. be denied; and it is further

**ORDERED** that summary judgment on H & K's counterclaim be denied at this point in the proceeding.