**Julie Hiatt STEELE, Plaintiff,**

v.

**Michael ISIKOFF, Newsweek Magazine, and the Washington Post Company, Inc., Defendants.**

**No. 98CV1471.**

United States District Court, District of Columbia.

Sept. 6, 2000.

John Purcell Coale, Diane Elizabeth Cooley, Deborah Lee St. Jean, Coale, Cooley, Lietz, McInerny & Broadus, Washington, DC, for plaintiff.

Roger Campbell Spaeder, Zuckerman, Spaeder, Goldstein, Taylor & Kolker, L.L.P., Washington, DC, for defendants.

## MEMORANDUM OPINION

KOLLAR-KOTELLY, District Judge.

Plaintiff Julie Hyatt Steele ("Steele") brought suit against Newsweek reporter Michael Isikoff ("Isikoff"), Newsweek Magazine ("Newsweek"), and the Washington Post ("Washington Post") (collectively, "Defendants") based on the Defendants' alleged failure to honor an agreement not to reveal that Steele was a source of information Defendants published. *See, e.g.,* Am.Compl. ¶ 118. Steele's Amended Complaint addresses the alleged misconduct of Isikoff in eight separate counts in which she claims breach of contract (Counts I and II); promissory estoppel (Count III); fraud (Count IV); negligent misrepresentation (Count V); unjust enrichment (Count VI); intentional infliction of emotional distress (Count VII); and breach of fiduciary duty/duty of confidentiality (Count VIII). Steele also claims that Newsweek and the Washington Post are vicariously liable under the doctrine of respondeat superior (Count IX), that Newsweek is liable for negligently hiring and supervising Isikoff (Count X), and that Steele is entitled to punitive damages (Count XI). *See id.* ¶¶ 50–115.

Before the Court is Defendants' Motion to Dismiss in which they assert that (1) the First Amendment bars all of Steele's claims collectively, and (2) each of her claims fails individually as a matter of common law. *See* Defs.' Mot. to Dismiss; Mem. in Supp. of Defs.' Mot. to Dismiss at 2–3 [hereinafter Defs.' Mem.]. The Court concludes that Steele's suit cannot be completely dismissed on First Amendment grounds, but that each of individual claims merits dismissal for failure to state a claim under the applicable state law.

## I. BACKGROUND

Steele is a citizen of the Commonwealth of Virginia, *see* Am.Compl. ¶ 3, and Isikoff is a resident of the District of Columbia, *see id.* ¶ 4. Newsweek, Inc., sued as News-

week Magazine, has offices in the District of Columbia and is wholly owned by the Washington Post. *See id.* ¶ 5. Newsweek Magazine is an unincorporated division of Newsweek, Inc., a New York corporation. *See* Defs.' Mem. at 34–35. The Washington Post, sued as The Washington Post Company, Inc., is incorporated in Delaware; its principal place of business is the District of Columbia. *See* Am.Compl. ¶ 6. At all times relevant to this case, Isikoff was an employee of Newsweek. *See id.* ¶ 7.

During the course of his employment at Newsweek, Isikoff investigated various stories about the private life of President William Jefferson Clinton. *Id.* ¶ 7. In late 1997, Isikoff began working on a story about an improper encounter between Kathleen Willey and the President that allegedly occurred at the White House in November 1993.[1] *See id.* ¶ 8. Steele alleges that Isikoff entered her life at the direction of Kathleen Willey, Steele's longtime friend, when Willey telephoned Steele to request that she talk to Isikoff about the alleged encounter. *See id.* ¶ 9. Steele states that within minutes of her conversation with Willey, Isikoff called her and requested driving directions to her home. *See id.* ¶ 9. Steele gave the directions to Isikoff and he arrived at her home shortly thereafter. *See id.* ¶¶ 9, 14.

Prior to Isikoff's arrival at Steele's home, Willey purportedly called Steele back to inform her of the nature of Isikoff's visit. *See id.* ¶ 10. Steele states that this conversation was tile first time that Willey told her of the alleged sexual encounter between Willey and the President. *See id.* ¶ 12. Steele further alleges that Willey gave Steele a prepared story to tell Isikoff—that on the day of the alleged encounter. Willey went from the White House to the commuter train, and from the train station to Steele's home. *See id.* ¶ 11. Steele also states that Willey asked her to tell Isikoff that Willey appeared upset and humiliated after the encounter with the President, and that she reported to Steele that the President had "groped" her. *Id.* ¶ 11. Steele asserts that she was uncomfortable with the prospect of relaying information about which she had no first-hand knowledge. *See id.* ¶ 13. Nonetheless, because Willey assured her that the conversations would be off the record and because she was afraid that Willey would be angry if she did not speak to Isikoff, Steele agreed to confirm Willey's story. *See id.* ¶ 13.

Steele alleges that she and Isikoff discussed the nature of their conversation and the manner in which he would use the information he gained. *See id.* ¶¶ 15–18, 23–24. Steele states that she and Isikoff agreed "explicitly and verbally" that her statements regarding Kathleen Willey's encounter would be off the record. *Id.* ¶ 15. Steele claims that she and Isikoff both understood that "off the record" meant that Isikoff would take "her statements in confidence … and neither [her] statements nor her name would be printed by Isikoff or Newsweek." *Id.* ¶¶ 16–17. Steele states that she would not have spoken to Isikoff at all if he had not agreed that their conversations would be strictly off the record. *See id.* ¶ 18. Steele further asserts that she and Isikoff discussed the fact that he would call Steele first should he ever intend to print a story about Willey's accusations. *See id.* ¶ 24.

According to Steele, Isikoff called her on July 28 and 29, 1997, in an attempt to reach Willey. *See id.* ¶¶ 25–26. During the latter call, Steele claims that Isikoff told her that he was under pressure to print the Willey story. *See id.* ¶ 26. Steele requested a personal meeting with Isikoff before the story was printed. *See id.* ¶ 26. After a series of phone conversations in which it became clear that Steele and Isikoff could not meet in person, Steele agreed to discuss the matter with him over the phone on the morning of July

---

1. Early in the President Clinton's first term, Kathleen Willey served as a volunteer and employee at the White House. *See* Am. Compl. ¶ 12.

31, 1997. *See id.* ¶¶ 26–28. Steele alleges that she and Isikoff "explicitly and verbally agreed" that the conversation on the morning of July 31, 1997 would be off the record. *Id.* ¶ 29. During the July 31 conversation, Steele told Isikoff that she had lied to him when she recounted Willey's story regarding her alleged encounter with the President. *See id.* ¶ 30. Steele explained that in actuality she had no knowledge of an encounter between Willey and the President at any time. *See id.* ¶ 30. Steele ended the conversation with Isikoff with the purported mutual understanding that Newsweek "no longer had a story to print." *Id.* ¶ 31–32.

In the hours immediately following Steele's July 31 conversation with Isikoff, Steele alleges that Isikoff and his editors decided that they needed either Willey or Steele on the record. *See id.* ¶ 34. Steele suggests that Isikoff and Newsweek made this decision because Steele had recanted her story, leaving Isikoff without the two corroborating sources that journalistic standards require in order to proceed with the story. *See id.* ¶ 34. Later that same afternoon, Steele alleges that Isikoff called her to inform her that her name and her statements would appear in his story. *See id.* ¶ 36. During this conversation, Steel maintains that she again told Isikoff that all of their conversations, including the present one, were off the record. Isikoff allegedly responded that the decision was "out of [his] hands" due to mounting pressure to print the story. *Id.* ¶ 37. Newsweek and Isikoff published stories naming Steele and reporting her statements to Isikoff on August 11, 1997, March 9, 1998, and March 30, 1998. *See id.* ¶ 38. In conjunction with the articles, Isikoff made numerous television appearances and Newsweek issued a press release repeating this information. *See id.* ¶¶ 38–39. Steele further asserts that Isikoff falsely accused her of attempting to sell her story to the tabloids. *See id.* ¶ 43.

Steele contends that Isikoff and Newsweek were well aware that by publishing her name in connection with the scandals surrounding the President's personal life, they were thrusting her into a public spotlight in which she did not want to appear. *See id.* ¶¶ 41–43. In addition, Steele claims that both Isikoff and Newsweek have profited by publishing Steele's statements about the Willey story. *See id.* ¶ 40.

Seeking damages for injury to her reputation, embarrassment, humiliation, loss of earning capacity, anguish, and severe emotional distress, *see id.* ¶ 118, Steele filed the instant suit against Isikoff, the Washington Post, and Newsweek. In Counts I and II (Breach of Contract), Steele alleges that Isikoff breached two separate contracts by publishing Steele's name in conjunction with the Willey story. Steele asserts that the contracts formed when Isikoff agreed, on two separate occasions, to protect her identity in exchange for information about the Willey incident. Steele alleges in Count III (Promissory Estoppel) that the Court should enforce Isikoff's promises that their conversations would be "off the record" because Steele relied on those promises to her detriment. Steele also charges Isikoff with fraud (Count IV), negligent misrepresentation (Count V), unjust enrichment (Count VI), intentional infliction of emotional distress (Count VII), and breach of fiduciary duty (Count VIII). Finally, Steele contends that Newsweek and the Washington Post are vicariously liable for Isikoffs acts, under the theory of respondeat superior (Count IX) or negligent hiring and supervision (Count X), and that she is entitled to punitive damages as a result of Isikoff's and Newsweek's conduct (Count XI).

Defendants raise a host of arguments in support of their contention that Steele's amended complaint should be dismissed in its entirety. First, Defendants argue that Steele's amended complaint is a thinly disguised effort to avoid the First Amendment's heightened threshold for reputational damages based on publication. *See* Defs.' Mem. at 2. Relying on

Steele's own admission that she lied to Isikoff, the Defendants argue next that (1) Steele's equitable claims should be dismissed because she has "unclean hands," (2) Steele's contract claims fail because she committed the first material breach, and (3) Steele's tort claims are deficient because her conduct "vitiates any claim of causation or reliance," *Id.* Under a more traditional analysis, Defendants also contend that the alleged contracts are too vague to be enforced, and that the tort claims against Isikoff fail as a matter of law. *See id.* Finally, Defendants argue that Steele fails to allege any facts to support her respondeat superior or negligent hiring and supervision claims. *See id.* at 3.

## II. DISCUSSION

Defendants move to dismiss the amended complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. A motion to dismiss should be granted only if the "plaintiff[ ] can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C.Cir. 1994) (citing *Schuler v. United States,* 617 F.2d 605, 608 (D.C.Cir.1979)). When considering a motion to dismiss, the Court must resolve all factual doubts in favor of the plaintiff and allow the plaintiff the benefit of all inferences. *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C.Cir.1997).

Notwithstanding this liberal construction, "the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." *Kowal,* 16 F.3d at 1276; *see also Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986).

## A. Defendants' First Amendment Argument

Preliminarily, Defendants urge the Court to dismiss Plaintiff's entire suit on First Amendment grounds. *See* Defs.' Mem. at 7–14. Specifically, they assert that Steele's claims amount to nothing but a thinly disguised effort to collect damages for defamation without meeting the constitutional requirements of a defamation claim. *See id.* at 7–8. Arguing that *Hustler Magazine v. Falwell,* 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988), and *Cohen v. Cowles Media Co.,* 501 U.S. 663, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991), bar plaintiffs from obtaining reputational damages from media defendants without proving defamation, Defendants maintain that the damages Steele seeks all relate to her reputation and that she has failed to put forth a defamation claim. *See* Defs.' Mem. at 8–14. Therefore, Defendants conclude, the Court must dismiss all of Steele's claims.

Defendants' portrayal of the applicable First Amendment jurisprudence is accurate. In *Hustler,* the Supreme Court held that public figures may not recover for harm to reputation under a claim of intentional infliction of emotional distress without meeting the strict constitutional requirements of a defamation claim. *See Hustler Magazine,* 485 U.S. at 56, 108 S.Ct. 876. In other words, even though the *Hustler* plaintiff pled intentional infliction of emotional distress and not defamation, the Court determined that the First Amendment requires claimants to meet the constitutional defamation requirements in order to obtain reputational damages, regardless of the claim under which such damages are sought. *See id.* at 56, 108 S.Ct. 876 (reaffirming that "[f]reedoms of expression require 'breathing space' " and that such breathing space is protected by the First Amendment limits on defamation claims).

Three years after issuing the *Hustler* decision, the Supreme Court had occasion to apply the *Hustler* reasoning in *Cohen,* a case with many apparent similarities to the

one at issue here.[2] The *Cohen* majority began by confirming that First Amendment protections, iron-clad and far-reaching though they may be, do not allow the media to break the law in its efforts to gather the news. Specifically, the Court held that "generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news." *Cohen*, 501 U.S. at 669, 111 S.Ct. 2513. The Court proceeded to determine that the plaintiff's promissory estoppel claim was rooted in a "generally applicable law" inoffensive to the First Amendment because the doctrine of promissory estoppel does not "target or single out the press." *Id.* at 670, 111 S.Ct. 2513.

The *Cohen* Court also found that the restrictions outlined in *Hustler* were not applicable in *Cohen* because the *Cohen* plaintiff had not "attempt[ed] to use a promissory estoppel cause of action to avoid the strict requirements for establishing a libel or defamation claim." *Id.* at 671, 111 S.Ct. 2513. The Court reached this conclusion upon determining that the plaintiff sought damages "for breach of a promise that caused him to lose his job and lowered his earning capacity," not "for injury to his reputation or his state of mind." *Id.*

Viewed in tandem, *Hustler* and *Cohen* divide claims against the news media by categorizing the damages sought. If a party seeks damages for harm to reputation or state of mind, the suit can only proceed if that party meets the constitutional requirements of a defamation claim. If a party seeks damages for non-reputational harms, which include lost jobs and diminished employment prospects, then the First Amendment does not bar suit as long as the claims are brought under generally applicable laws.

In the case before this Court, complete dismissal on First Amendment grounds would be inappropriate because the character of Steele's damages is not definite at this early stage. While Defendants urge the Court to conclude that all of Steele's alleged harm is to her reputation, Steele's amended complaint does not necessarily lead to such a conclusion. On the contrary, Steele's pleadings carefully portray some of her harm as analogous to that of the plaintiff in *Cohen* and therefore not restricted by the *Hustler* decision. Specifically, while Steele does allege reputational injury, she also argues that she has suffered occupational harm as a result of Defendants' conduct.

Quite possibly, following discovery Defendants could demonstrate that the damages Steele seeks are all for harm to her reputation. On a motion to dismiss, however, the Court must accept the plaintiff's version of events. Steele has alleged that she has suffered reputational and non-reputational harm as a result of Defendants' conduct. To the extent that her claims call for reputational damages, they are barred under the First Amendment and therefore dismissed. To the extent that she seeks damages for non-reputational harm, the claims survive Defendants' constitutional challenge. In light of the Court's conclusions regarding each of Steele's individual claims, however, there is no need to attempt to break down the precise damages—harm to reputation or not—that follow from each individual claim.

## B. Choice of Law For Common Law Claims

In this diversity action between a citizen of Virginia and citizens of the District of Columbia, each of Steele's claims turns on state law. In their motion, Defendants argue that there is a "false conflict" between Virginia and D.C. law as to

---

2. In *Cohen*, as here, the plaintiff sought damages from a media company that printed his name despite its reporters' assurances of con-

fidentiality. *See Cohen*, 501 U.S. at 665, 111 S.Ct. 2513.

almost all of Steele's claims.[3] *See* Defs.' Mem. at 7. Steele does not challenge this assertion in her opposition memorandum, and, during the hearing on Defendants' motion to dismiss, Steele agreed (through counsel) that there is a false conflict as to all of her claims except promissory estoppel (Count III). *See* 6/21/99 Tr. at 55–56.

"When confronted with a false conflict, a court may apply the law of the state whose policy would be advanced by the application of its law or forum law if no state's policy would be advanced by application of its law." *Greaves,* 984 F.Supp. at 14. The parties concur that Virginia law and D.C. law are largely interchangeable on all of the claims other than promissory estoppel. · *See* Defs.' Mem. at 7:6/21/99 Tr. at 55–56. To the degree that they are interchangeable, no state's policy is advanced by applying one over the other. Therefore, where the laws of D.C. and Virginia are the same, the Court will apply D.C. law because the District of Columbia is the forum jurisdiction.[4]

The parties are not in agreement on which law applies to Steele's promissory estoppel claim. In such ·cases, where courts must choose which jurisdiction's law to apply, "a federal court follows the choice-of-law rules of the jurisdiction in which it sits." *Stephen A. Goldberg Co. v. Remsen Partners, Ltd.,* 170 F.3d 191, 193 (D.C.Cir.1999) (citation omitted). Therefore, this Court applies the District of Columbia rule, which calls for "a modified governmental interests analysis which seeks to identify the jurisdiction with the most significant relationship to the dispute." *Dominion Caisson Corp. v. Clark,* 614 A.2d 529, 531 (D.C.1992).

After reviewing the allegations contained in Steele's amended complaint, the Court concludes that Virginia's relationship to the promissory estoppel dispute is far more significant than that of the District of Columbia. According to Steele, Isikoff first promised confidentiality during their only face-to-face meeting, which took place in Steele's home in Richmond, Virginia. *See* Am.Compl. ¶¶ 18–19. Steele claims that he made the promise again later over the telephone while she was in Virginia; Steele does not indicate where Isikoff was during that conversation. *See id.* ¶ 29–32. On both occasions, the conduct that allegedly resulted from the promise—Steele's statements to Isikoff regarding Willey's accusations—took place in Virginia. *See id.* ¶¶ 18–19, 27–30. Further, the impact of the eventual publication of Steele's name and statements befell her where she lived, in Richmond, and not in the District of Columbia.

In short, because Virginia has the stronger relationship to the dispute, the Court will apply Virginia law to Steele's promissory estoppel claim. Because the parties agree that there is a false conflict between the laws of D.C. and Virginia as to the other claims, the Court will apply the law of the forum—the District of Columbia—and point out any relevant discrepancies.

## C. Common Law Claims

Defendants' have moved to dismiss each of Steele's eleven counts independently, arguing that none of them states a claim for which relief can be granted under the relevant common law. The Court addresses each of the counts, and Defendants' arguments for dismissal, in turn.

### 1. Breach of Contract (Counts I and II)

According to Steele, her contract claims are straightforward. On two separate oc-

---

3. "A false conflict exists when the laws of the different states are: (1) the same; (2) different but would produce the same outcome under the facts of the case; or (3) when the policies of one state would be furthered by the application of its laws while the policy of the other state would not be advanced by the application of its laws." *Greaves v. State Farm Ins. Co.,* 984 F.Supp. 12, 14 (D.D.C. 1997); *see also Long v. Sears Roebuck, & Co.,* 877 F.Supp. 8, 11 (D.D.C.1995).

4. Where relevant D.C. law and Virginia law differ, the Court addresses those differences.

casions she promised to speak to Isikoff about Willey's accusations in exchange for Isikoff's promises that her statements and identity would be "off the record." Steele's contract claims based on that exchange of promises present an issue of first impression in the District of Columbia and in Virginia: whether a reporter's oral promise of confidentiality to a source constitutes a binding and enforceable contract.

In *Cohen v. Cowles Media Co.*, 457 N.W.2d 199 (Minn.1990), *rev'd on other grounds*, 501 U.S. 663, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991),[5] the only published decision from any jurisdiction that addresses this question, the Supreme Court of Minnesota concluded that contract law was not the appropriate vehicle for enforcement of a reporter's promise of confidentiality:

> We are not persuaded that in the special milieu of media newsgathering a source and a reporter ordinarily believe they are engaged in making a legally binding contract. They are not thinking in terms of offers and acceptances in any commercial or business sense. The parties understand that the reporter's promise of anonymity is given as a moral commitment, but a moral obligation alone will not support a contract.... Indeed, a payment of money which taints the integrity of the newsgathering function, such as money paid a reporter for the publishing of a news story, is forbidden by the ethics of journalism.
>
> . . . . .
>
> ... The durability and duration of the confidence is usually left unsaid, dependent on unfolding developments; and none of the parties can safely predict the consequences of publication....

In other words, contract law seems here an ill fit for a promise of news source confidentiality. To impose a contract theory on this arrangement puts an unwarranted legal rigidity on a special ethical relationship, precluding necessary consideration of factors underlying that ethical relationship. We conclude that a contract cause of action is inappropriate for these particular circumstances.

*Cohen*, 457 N.W.2d at 203 (internal citations omitted).

Even though the Minnesota Supreme Court was engaged in an analysis of Minnesota contract law, its reasoning applies in this case. As aptly described by the Minnesota court, journalistic ethics effectively bar reporters and sources from entering traditional contracts relating to the provision of information or the publication of stories. Because ordinary contractual considerations are inapplicable in this context, a reporter-source confidentiality arrangement is more appropriately viewed as a moral commitment.

■ As in Minnesota, moral obligations do not give rise to contractual liability under the laws of the District of Columbia or Virginia. *See, e.g., Baker v. District of Columbia*, 39 App.D.C. 42, 44–45 (App. D.C.1912) ("It is elementary in the law of contracts that a promise of a person competent, made under a sense of moral obligation ... is not legally binding."); *Mihalcoe v. Holub*, 130 Va. 425, 107 S.E. 704, 706 (1921) ("[A] mere moral obligation is not a sufficient foundation for an implied contract...."). Accordingly, because a reporter's promise of confidentiality is a moral obligation, not a contractual requirement, and because a moral obligation does not give rise to express or implied contractual duties, there is no contractual rela-

---

5. The Supreme Court's subsequent review of this reporter-source case provides much of the grist for the constitutional analysis in this case. *See supra.* The Supreme Court accepted the Minnesota court's determination that reporter-source relationships are not contractual under Minnesota law, but disagreed with the Minnesota court's conclusion that "enforcement of the promise of confidentiality under a promissory estoppel theory would violate defendants' First Amendment rights." 501 U.S. at 667, 111 S.Ct. 2513 (quoting 457 N.W.2d at 205).

tionship between Steele and Isikoff. Without contracts on which to base them, Steele's breach of contract claims will be dismissed.

 Even if the courts of the District of Columbia (or Virginia) were to determine that a reporter-source confidentiality agreement gives rise to a contractual relationship, Isikoff would have been relieved of his duty to abide by his promise under the alleged first contract because of Steele's pre-existing intent to lie. He would also have had no duty to perform under the second alleged contract, both because the second alleged contract is not itself a contractual arrangement separate from the first, and because it is not supported by consideration.

Under District of Columbia law, "every contract [contains] an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing." *Hais v. Smith,* 547 A.2d 986, 987 (D.C.1988); *see also Pennsylvania Life Ins. Co. v. Bumbrey,* 665 F.Supp. 1190, 1195 (E.D.Va.1987) ("Under Virginia law, every contract contains an implied covenant of good faith and fair dealing in the performance of the agreement."). The implied duty of good faith and fair dealing "prevents a party from evading the spirit of the contract, willfully rendering imperfect performance or interfering with the other party's performance." *Hais,* 547 A.2d at 987–88.

As Steele recounts in her amended complaint, she intended to lie to Isikoff about Willey's accusations before she entered into the first confidentiality "contract" with him, and she proceeded to do just that after they made their arrangement. Steele's lie is the epitome of bad faith. Rather than provide the reporter with her personal knowledge of the incident in question, Steele "evad[ed] the spirit of the contract" by deceiving him. *Id.* Plainly, Steele's conduct amounts to "imperfect performance" in violation of the implied duty of good faith and fair dealing. *Id.* Because Steele breached the alleged first contract by providing deceptive information, Isikoff was relieved of his duty to live up to his side of the bargain. *See* Restatement (Second) of Contracts § 237 (1981) ("[I]t is a condition of each party's remaining duties to render performances ... that there be no uncured material failure by the other party to render any such performance due at an earlier time."); *id.* cmt. a ("[A] material failure of performance, including defective performance as well as an absence of performance, operates as the non-occurrence of a condition [which] discharg[es] the [other party's corresponding] duty when the condition can no longer occur."); *see generally Ellis v. James V. Hurson Assocs. Inc.,* 565 A.2d 615, 618 (D.C.1989) (adopting the Restatement "[i]n the absence of any current well-developed doctrine in our jurisdiction").[6]

Arguably, the alleged second contract between Steele and Isikoff does not suffer from Steele's earlier bad faith: she herself initiated the formation of the alleged second contract precisely because she wanted to disavow her prior statements and tell the truth. Nonetheless, despite her nobler intentions the second time around, Steele's second contract claim fails along with the first.

Initially, even though Steele strives to present an image of two separate encounters in which she and Isikoff entered into two separate contracts, the facts alleged in her amended complaint lead the Court to conclude that there was, at most, only a single "contract." Steele agreed to tell Isikoff what she knew about Willey's accusations, and he agreed to keep her identity

---

6. Virginia law is the same. *See Horton v. Horton,* 254 Va. 111, 487 S.E.2d 200, 204 (1997) ("If the initial breach is material, the other party to the contract is excused from performing his contractual obligations.").

confidential. When she ultimately decided to recant her earlier statements, she was still operating within the scope of the initial (and only) alleged contract: she told him what she knew about Willey, and he agreed to keep the conversation off the record. Because there was only one alleged contract, any shortcomings in its performance would impact its validity in regard to both of the occasions on which Steele and Isikoff spoke. Accordingly, since the initial contract claim suffers from Steele's lack of good faith, the entire alleged contractual relationship suffers from that failing.

Alternatively, Steele's claim regarding the alleged second contract fails because it lacks any independent, valid consideration. It is a basic tenet of contract law that a party's agreement to perform a preexisting duty is "a typical example of invalid consideration." *United States v. Bridgeman,* 523 F.2d 1099, 1110 (D.C.Cir.1975); *see also Interdonato v. Interdonato,* 521 A.2d 1124, 1134 (D.C.1987) (stating principle). The obligation that Steele accepted at the time of her second conversation with Isikoff was identical to the one she accepted when they first spoke. Even though Steele knew that she would convey altogether different information to Isikoff during the second conversation, she agreed on both occasions to tell Isikoff what she knew about Willey's accusations. Because she had already agreed to that duty during the first conversation, it preexisted the second conversation, and therefore cannot serve as consideration for the alleged second contract.

In sum, the Court determines that the relationship between a reporter and a source is not contractual in nature. Even if reporters and their sources could form contracts, however, Steele's lie breached the alleged reporter-source contract in this case, thereby relieving Isikoff of his duty to perform. While her lie may not impact the alleged second contract, that alleged contract is properly viewed as a continuation of the first, and it lacks valid, independent consideration. Accordingly, Defendants' motion to dismiss shall be granted as to Steele's breach of contract claims.

**2. Promissory Estoppel and Unjust Enrichment (Counts III and VI)**

Steele's amended complaint also raises two equitable claims. First, she contends that she is entitled to relief under the doctrine of promissory estoppel:[7] Isikoff promised confidentiality, she relied on that promise when she agreed to provide him with information, and her reliance proved to be detrimental because it led to the harm she suffered. *See* Am.Compl. ¶¶ 61–60.[8]

■ Virginia law does not recognize the doctrine of promissory estoppel. *See W.J. Schafer Assocs., Inc. v. Cordant, Inc.,* 254 Va. 514, 493 S.E.2d 512, 516 (1997) ("[P]romissory estoppel is not a cognizable cause of action in the Commonwealth, and we decline to create such a cause of action.") Because Virginia law governs to Steele's promissory estoppel argument, Steele has failed to state a claim under which relief can be granted, and the claim shall be dismissed.[9]

7. As previously noted, the Court has determined that Virginia law applies to Steele's promissory estoppel claim. *See supra.*

8. Unlike her contract claims, in which Steele alleges separate breaches of two distinct contracts, Steele's single promissory estoppel claim is rooted in her alleged reliance on Isikoff's general promise of confidentiality. Since she has not alleged two separate instances of promissory estoppel, the Court has not engaged in a two-tiered analysis, as it did in regard to the contract claims.

9. Like unjust enrichment, promissory estoppel is an "inherently equitable doctrine." *Moss v. Stockard,* 580 A.2d 1011, 1035 (D.C. 1990). Therefore, although the Court dismisses Steele's promissory estoppel argument for failing to state a claim under Virginia law, the argument would fail under D.C. as well for the reasons set forth in the following discussion of her unjust enrichment claim.

Second, Steele argues that the Defendants have improperly profited as a result of Isikoff's alleged promise, her alleged reliance on that promise, and Isikoff's alleged pre-existing intent to disregard the promise he made. *See* Am. Compl. ¶¶ 82–87.

The courts of the District of Columbia, which have acknowledged that unjust enrichment is an equitable doctrine, *see National Union Fire Ins. Co. v. Riggs Nat'l Bank,* 646 A.2d 966, 969 (D.C.1994), prohibit plaintiffs with unclean hands from obtaining equitable relief:

> In an action in equity, 'he who asks relief must have acted in good faith. The equitable powers of th[e] court can never be exerted in behalf of one who has acted fraudulently or who by deceit or any unfair means has gained an advantage. To aid a party in such a case would make th[e] court the abetter of iniquity.' ... Thus, while 'equity does not demand that its suitors shall have led blameless lives, ... it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue.'

*Synanon Found., Inc. v. Bernstein,* 503 A.2d 1254, 1264 (D.C.1986) (citations omitted).

Steele's conduct in this case bars the equitable remedy she seeks. As she admits in her amended complaint, she set out to lie to Isikoff and, after reaching the confidentiality arrangement with him, she practiced her deception, just as she had planned. Steele, a "suitor" of equitable relief, acted with "deceit as to the controversy in issue." *Id.* Accordingly, her unjust enrichment claim shall be dismissed. *See id.* ("A plaintiff's non-compliance with this [clean hands] requirement warrants dismissal of his action.").

### 3. Fraud and Negligent Misrepresentation (Counts IV and V)

In Counts IV and V of her amended complaint, Steele argues that Isikoff is liable in tort for (1) fraud and (2) negligent misrepresentation because of his alleged misconduct. In her fraud claim, she asserts that "Isikoff intentionally misrepresented to Ms. Steele that he would not print her name or any statements she made to him." Am.Compl. ¶ 68. In the claim for negligent misrepresentation, Steele states that "Isikoff negligently and/or recklessly misrepresented to Ms. Steele that he would not print her name or any statements she made to him." *Id.* ¶ 75.

Defendants challenge both of the tort claims on the ground that Isikoff's conduct was not the cause of Steele's harm. Rather, they assert, Steele's own lie proximately caused whatever injury she suffered. Defendants conclude by reasoning that without a showing that Isikoff proximately caused the harm, she is unable to state a claim for which relief can be granted. *See* Defs.' Mem. at 24.

The courts of the District of Columbia subscribe to the fundamental principle that a plaintiff in a tort action cannot recover without showing that the defendant's challenged conduct proximately caused plaintiff's injury. *See* Prosser & Keaton, The Law of Torts § 41, at 263 (5th ed.1984) (stating that proximate cause is an essential element of any tort); *Thompson v. Shoe World, Inc.,* 569 A.2d 187, 189 (D.C.1990) (accepting the Prosser & Keaton formulation). A defendant's conduct is the proximate cause of a plaintiff's injury only if "the injury is the natural and probable consequence of the negligence or wrongful act and ought to [have been] foreseen in light of the circumstances." *Sanders v. Wright,* 642 A.2d 847, 849 (D.C. 1994) (quoting *Ceco Corp. v. Coleman,* 441 A.2d 940, 944 (D.C.1982)).

Despite Steele's conclusory assertions that the harm she suffered was the "direct and proximate result of Isikoff's intentional misrepresentation and his subsequent printing of Ms. Steele's name and statements." Am.Compl. ¶¶ 73, 80, her own depiction of the facts indicates otherwise.

Notably, Steele argues that the publication hurt her because it "thrust [her] into the national and international spotlight," *id.* ¶ 118, and caused her "name and personal life [to be] discussed on countless occasions by various news organizations, including scores of newspapers around the country, national and local television news programs, and hundreds of news-related Internet 'websites'." *Id.* ¶ 119.

Painful as the glaring spotlight may be, Steele's harm is rooted in her own lie, a deception by which she alone tied herself to a sordid news story that dominated all types of media. In other words, Steele has suffered because people—friends, employers, customers, and even strangers— changed their opinions of her after she was unflatteringly tied to the Clinton–Willey saga. That link to President Clinton and Kathleen Willey, however, was not the work of Isikoff. On the contrary, Steele herself decided to fabricate her connection to Willey's accusations. While Isikoff printed that fabrication and Steele's subsequent recantation, Steele herself proximately caused the harm.[10]

In short, because Steele's conduct, not Isikoff's, proximately caused her harm, she cannot make out claims for the torts of fraud or negligent misrepresentation. Consequently, the claims will be dismissed.

### 4. Intentional Infliction of Emotional Distress (Count VII)

In Count VII, Steele alleges that Isikoff intentionally engaged in "extreme and outrageous" conduct toward her, and that she suffered "extreme and severe emotional distress" as a result. Am.Compl. ¶¶ 89, 92, 93.

 In order to state a claim for the intentional infliction of emotional distress in the District of Columbia, a plaintiff must allege "(1) 'extreme and outrageous' conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff 'severe emotional distress.' " *Sere v. Group Hospitalization, Inc.,* 443 A.2d 33, 37 (D.C.1982) (citing Restatement (Second) of Torts § 46 (1965)), *cert. denied,* 459 U.S. 912, 103 S.Ct. 221, 74 L.Ed.2d 176 (1982).[11]

10. Courts in two other districts have taken the same approach to the issue of causation in fraud claims against media defendants. In *Food Lion, Inc. v. Capital Cities/ABC, Inc.,* 964 F.Supp. 956 (M.D.N.C.1997), *aff'd in part and rev'd in part on other grounds, Food Lion, Inc. v. Capital Cities/ABC, Inc.,* 194 F.3d 505 (4th Cir.1999), two producers from an ABC news program were hired by Food Lion after submitting false employment histories with their job applications. After the producers filmed and broadcast footage of Food Lion's unsavory food-handling practices, Food Lion brought suit for fraud in which it sought to recover lost profits and sales. *See Food Lion,* 964 F.Supp. at 958. The court determined that "it was the food handling practices themselves—not the method by which they were recorded or published—which caused the loss of consumer confidence." *Id.* at 963.

In *Frome v. Renner,* No. 97 Civ. 5641 (C.D.Cal. Oct. 1, 1997), a physician brought suit after a CBS reporter held himself out as a patient and then broadcast a report in which he claimed that the physician's "methods were 'total nonsense.' " *Id.* at 1–2. The court determined that the plaintiff's harm was not the result of defendant's alleged fraud, but

was rather caused by the physician's medical practices. *See id.* at 4–5. Recognizing that *Frome* is an unpublished decision issued in another jurisdiction, the Court describes it merely to highlight the consistency of reasoning among these cases.

11. Virginia's courts hold the tort of intentional infliction of emotional distress in disfavor. *See, e.g., Russo v. White,* 241 Va. 23, 400 S.E.2d 160, 162 (1991), citing *Ruth v. Fletcher,* 237 Va. 366, 377 S.E.2d 412, 415 (1989) (remarking that the tort is "not favored in the law" because it does not "provide clear guidance either to those whose conduct it purports to regulate, or to those who must evaluate that conduct"); *but see Russo,* 400 S.E.2d at 163 (Hassell, J., dissenting) ("Even though the tort ... is a disfavored cause of action, it remains a viable cause of action until it is abolished.").

Notwithstanding their general disfavor, Virginia courts apply the same basic standard as do D.C. courts in evaluating whether a claim exists. *See Womack v. Eldridge,* 215 Va. 338, 210 S.E.2d 145, 148 (listing elements of the tort: (1) "the wrongdoer's conduct was intentional or reckless," (2) "the conduct was out-

As a threshold matter, Steele's emotional distress claim must be dismissed because it suffers from the same failings of causation described in the Court's analysis of her fraud and negligent misrepresentation claims. Steele's emotional distress claim also fails, however, because she has not alleged facts that satisfy all the elements of the tort.

To be "extreme and outrageous" in satisfaction of the first element under D.C. law, the defendant's conduct must "go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Sere*, 443 A.2d at 37 (citing Restatement (Second) of Torts § 46 (1965)). While Steele alleges in conclusory fashion that Isikoff "acted in an extreme and outrageous manner" and that his "conduct . . . is utterly outrageous and intolerable in a civilized society," Am.Compl. ¶¶ 89, 92, she fails to allege facts that support such a conclusion.

Steele claims that Isikoff intentionally misrepresented himself, that he broke his promise of confidentiality, and that he "falsely report[ed] in his articles and television appearances that Ms. Steele had attempted to sell her story to a tabloid." *Id.* ¶ 90. While this alleged conduct may be contrary to journalistic standards and upsetting to sources like Steele, it does not approach the high "extreme and outrageous" standard required by D.C. law. *See, e.g., Smith v. Union Labor Life Insurance Co.*, 620 A.2d 265, 269–270 (D.C. 1993) (holding that dismissing an employee without following disciplinary procedures is not extreme and outrageous); *Adams v. George W. Cochran & Co.*, 597 A.2d 28, 35

(D.C.1991) (firing an employee for refusing to violate the law is not extreme and outrageous); *Waldon v. Covington*, 415 A.2d 1070, 1077–1078 (D.C.1980) (holding that defendant's refusal to give plaintiff keys to laboratory, failure to notify plaintiff of departmental meetings, threats of lawsuits, and deliberate efforts to embarrass plaintiff do not meet the legal standard for emotional distress).[12]

Although Steele has deployed the requisite emotional distress buzzwords in her amended complaint, she has not pled facts supporting the conclusion that Isikoff's conduct was "extreme and outrageous." Without such facts, she cannot satisfy the first element of the tort. Because she is unable to satisfy that element, she has failed to state a claim upon which relief can be granted, and the claim will therefore be dismissed.

### 5. Breach of Fiduciary Duty/Duty of Confidence (Count VIII)

Like her contract claims, Steele's breach of fiduciary duty claim raises general questions about the nature of the relationship between reporter and source as well as specific questions about the relationship between Isikoff and Steele.

The Defendants correctly point out that no court in any jurisdiction has ever recognized the existence of a fiduciary or confidential relationship between a reporter and his or her source. Moreover, the Court notes that the mere existence of a contractual relationship is ordinarily insufficient to give rise to a fiduciary duty. *See Church of Scientology Int'l v. Eli Lilly & Co.*, 848 F.Supp. 1018, 1028 (D.D.C.1994)

---

rageous and intolerable," (3) "there was a causal connection between the wrongdoer's conduct and the emotional distress," and (4) "the emotional distress was severe"). In light of the similarity of the jurisdictions' approaches and Virginia's disfavor for the tort, there is no need to engage in a separate analysis under Virginia law.

12. In a case decided under Pennsylvania law, a newspaper published the identities of a mother and her children, one of whom was an alleged victim of sexual abuse, despite a reporter's promise of confidentiality. *See Morgan v. Celender*, 780 F.Supp. 307 (W.D.Pa. 1992). The court, relying on the same Restatement provision that D.C. courts have adopted, held that "the publication of the article . . . was not outrageous in character, or so extreme in degree, as to go beyond all possible bounds of decency in a civilized community." *Id.* at 310.

(citing *Don King Prods., Inc. v. Douglas*, 742 F.Supp. 741, 769 (S.D.N.Y.1990)).

Notwithstanding the absence of any favorable precedent, Steele counters that the existence of a fiduciary or confidential relationship "is a fact-intensive question, involving a searching inquiry into the nature of the relationship, the promises made, the type of services or advice given, and the legitimate expectation of the parties." *Id.* (denying public relations firm's motion for summary judgment "even though no Court has ever found there to be a fiduciary relationship between a public relations firm and one of its clients"). On these grounds alone, Steele asserts that her bare allegation that she "entered into a confidential and/or fiduciary relationship wherein Isikoff received Ms. Steele's statements in trust and confidence based both upon his status as a professional journalist and his explicit agreement not to print Steele's statements" permits an inference that such a relationship existed. Am.Compl. ¶ 95.

Although the Court must construe the amended complaint in Steele's favor, it "need not accept inferences drawn by the plaintiff[ ] if such inferences are not supported by the facts set out in the complaint." *Kowal*, 16 F.3d at 1276. Similarly, the Court need not "accept legal conclusions cast in the form of factual allegations." *Id.* As the *Scientology* court observed. "[t]he existence of a fiduciary relationship would depend on whether the parties, through the past history of the relationship and their conduct, had extended the relationship beyond the limits of the contractual obligations." *Church of Scientology Int'l*, 848 F.Supp. at 1028.

Even if everything that Steele alleges were true, her relationship with Isikoff was simply too fleeting and too superficial to give rise to a fiduciary duty. *See Hopper v. Financial Mgmt. Sys.*, No. 96–456, 1997 WL 31101, *5–*6 (D.D.C. Jan 23, 1997) (granting summary judgment where relationship lacked the "traditional earmarks" of a fiduciary relationship);

*O'Hearn v. Bodyonics, Ltd.*, 22 F.Supp.2d. 7, 12 (E.D.N.Y.1998) (dismissing breach of fiduciary duty claim as a matter of law). By her own account, their contact was limited to several short telephone calls and one face-to-face meeting. This limited interaction stands in sharp contrast to the relationship alleged in *Scientology*, which spanned over two and one half years and entailed the performance of "substantial services" to the client. *See Church of Scientology Int'l*, 848 F.Supp. at 1023–24. While the client in *Scientology* entrusted the public relations firm with management of its affairs, Steele has not alleged that she expected Isikoff to advise her or take care of her affairs.

In short, neither of the parties has unearthed any support for the proposition that a reporter-source relationship entails a fiduciary duty and a duty of confidentiality. Even ignoring the absence of such precedent, however, the scope and duration of the relationship between Steele and Isikoff are too limited to give rise to such duties. Because those duties have not arisen in this case, Steele's claim based upon them shall be dismissed.

**6. Respondeat Superior, Negligent Hiring and Supervision, and Punitive Damages (Counts IX, X, and XI)**

In the last three counts of her amended complaint, Steele asks the Court to find the Defendants derivatively liable for the alleged conduct and resulting harms described in her first eight counts. The Court has already determined, however, that the conduct alleged in the first eight counts does not give rise to any primary liability. Without any primary liability, there can be no derivative liability. Accordingly, each of Steele's derivative claims will be dismissed.

**III. Conclusion**

For the reasons stated above, the Court has determined that Steele has failed to state a claim for which relief can be grant-

ed as to each of the eleven counts of her amended complaint. Therefore, the Court shall grant Defendant's motion to dismiss.